THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
JEAN S. HARRIS, Appellant.

Second Department, December 30, 1981

APPEARANCES OF COUNSEL

*Joel Martin Aurnou, Victor G. Grossman, Herald Price Fahringer* and *Elaine G. Brown* for appellant (one brief filed).

*Carl A. Vergari, District Attorney (Anthony Joseph Servino, Gerald D. Reilly* and *Richard E. Weill* of counsel), for respondent.

OPINION OF THE COURT

MOLLEN, P. J.

This appeal arises out of the homicide of Dr. Herman Tarnower, a noted Westchester cardiologist and proponent of the so-called Scarsdale Diet. His convicted slayer, defendant Jean Harris, was the divorced headmistress of the Madeira School in Virginia. She had been Tarnower's companion and paramour for over 13 years.

The prosecution's theory was that Mrs. Harris, desperately unhappy over the loss of Dr. Tarnower's affections and resentful of his relationship with a younger woman, entered his home, unannounced and unexpected, and intentionally shot him three times, causing his death. Mrs. Harris, who never denied having shot Dr. Tarnower, maintained that the shooting was accidental. She insisted that concerns over her troubled relationship with the doctor had played no part in her actions. Instead, she claimed that, consumed with feelings of her own inadequacy and distraught over setbacks in her professional life, she had decided to take her own life on the grounds of the Tarnower estate which she had grown to love and to think of as her home. She claimed that Dr. Tarnower, in his struggle to prevent her from committing suicide, was himself accidentally shot and killed.

Thus, the lines at trial were clearly drawn. The crucial question was whether Dr. Tarnower had been intentionally murdered or, instead, had died as a result of a tragic accident. The jury resolved the question in favor of the prosecution, convicting the defendant of intentional murder and other lesser related crimes.

Mrs. Harris does not contend that the proof at trial was legally insufficient to support a murder conviction or that the jury's verdict was against the weight of the evidence.

Instead, she argues that a variety of errors committed at trial deprived her of a full and fair opportunity to present and support her version of the incident before a properly constituted and impartial jury.

We turn first to a review of the evidence adduced from the more than 90 witnesses who appeared at the defendant's 14-week trial.

A. THE CASE FOR THE PROSECUTION

The prosecution's efforts to reconstruct the events in question rested primarily on the testimony of Suzanne van der Vreken, Dr. Tarnower's housemanager, and on the account of police officers who responded to the scene after the shooting. Mrs. van der Vreken, who had worked for Tarnower for 16 years, lived in the Tarnower home with her husband Henri who was himself employed as the doctor's estate manager. Mrs. van der Vreken's recollection was aided by a book in which she recorded the names of Dr. Tarnower's guests and the dates on which they visited his home.[1] She was thus able to provide a history of Tarnower's relationship with Mrs. Harris and with her rival, divorcée Lyn Tryforos.

Mrs. van der Vreken first met Jean Harris in 1967 at the Tarnower home. Harris soon became a frequent visitor there and often accompanied the doctor on trips abroad. She also vacationed with him on holidays. Whenever Harris spent the night at the Tarnower residence, she slept in his bedroom. According to Mrs. van der Vreken, however, Harris was not Dr. Tarnower's only love interest.

Mrs. van der Vreken testified that, in early 1975, she became aware that the doctor was dating his employee, Lynn Tryforos. As time passed, Tryforos' visits to the Tarnower home became more frequent, and on various occasions she was invited to spend the night. Like Harris, when Tryforos stayed overnight at the house, she slept in Tarnower's bedroom. Although Dr. Tarnower dated other women after 1975, only Harris and Tryforos ever spent the night with him at his home.

---

1. A gourmet cook, Mrs. van der Vreken had kept those records in order to avoid serving a guest the same meal twice.

With Mrs. van der Vreken's help, Tarnower attempted to keep the two women apart. When Tryforos was expected, he would ask Mrs. van der Vreken to make sure that Harris' clothing and personal belongings were hidden away. When Harris was invited, the same would be done with any item belonging to Tryforos.

As Tryforos' visits became more frequent, Harris' seemed to become less so. According to Mrs. van der Vreken's book, Harris was a guest at the Tarnower home at least 63 times in 1977. In 1978 she spent the night on at least 49 occasions. In 1979 that number was reduced to 26.

Despite Tarnower's apparent efforts to keep the women apart, it was clear that they knew about each other. Indeed, Harris frequently spoke to Mrs. van der Vreken about Tryforos. Moreover, the rivalry was not always conducted on the highest level. In March, 1979, for example, Harris and Tarnower spent a week in the Caribbean. When they returned, Harris discovered that her clothing, kept in a closet on the first floor of Tarnower's home, had been ripped and slashed. Other than the servants, the only person in the house while Tarnower and Harris were on vacation was Lynn Tryforos. Mrs. van der Vreken mentioned the incident to Tarnower, but he took no action.

Tarnower and Harris spent the Christmas and New Year's holidays of 1979 together in Palm Beach, Florida. Thereafter, in early February, 1980, while Tarnower and Tryforos were traveling out of the country together, Mrs. Harris called Mrs. van der Vreken to ask if she would mind arranging a small dinner party for her son David who was getting married. Mrs. van der Vreken replied that she would not mind, provided that Tarnower approved. The request struck Mrs. van der Vreken as unusual since, whenever a party was planned, Tarnower would tell her about it well in advance. He had mentioned nothing of a party for David Harris. Nevertheless, in mid-February, a prewedding party was held for David in the Tarnower residence, and Mrs. van der Vreken described it as a joyous occasion. Mrs. Harris herself was Tarnower's overnight guest on the weekend of the party. She was not to return to Tarnower's home until the night of Monday, March 10, 1980.

On that date, at approximately 5:30 P.M., Harris drove her blue Chrysler to the house of the superintendent of buildings and grounds at the Madeira School. The car was assigned to her as Madeira's headmistress and bore Virginia license plates. Harris asked the superintendent if she could get some gasoline because she was late for a dinner party and was afraid that there would be a long line at the nearby gas station. The superintendent agreed and filled her car with gas. He noticed nothing unusual about Mrs. Harris that day except that she appeared to be in a great hurry.

Meanwhile, at the Tarnower house, Mrs. van der Vreken was preparing a dinner planned for the doctor, his niece Debbie Raizes, and Lynn Tryforos. Tryforos had spent the weekend with Tarnower at his home, and had left with him early that morning. Each had appeared to be in a good mood, and they were making plans for another trip.

In the late afternoon of March 10, 1980, prior to Tarnower's return from work, Mrs. van der Vreken received two telephone calls from Mrs. Harris. During the first call, Harris simply asked if Tarnower was at home and Mrs. van der Vreken replied that he was not. Sounding angry, Harris hung up. When Harris called back, she again asked if Tarnower was at home and, when Mrs. van der Vreken replied that he was not, Harris asked if he would be there for dinner. Mrs. van der Vreken said that he would not. Harris then asked if Tarnower planned to go to New York that evening, saying that she could meet him there. Mrs. van der Vreken said that she did not know. Mrs. van der Vreken testified that, during this second call, Harris sounded worried and, as she hung up, she seemed to be crying.

In answering Harris as she did, Mrs. van der Vreken was following Dr. Tarnower's instructions. Some six or eight months earlier, he had told her that, if he had guests when Mrs. Harris called, Mrs. van der Vreken was to tell her that he was not at home. Apparently Mrs. van der Vreken had also followed these directions when Harris had called on the preceding three days during which Tryforos had been Tarnower's houseguest.

Mrs. van der Vreken testified that, on the evening of March 10, 1980, Tarnower's bedroom was in perfect order. Tryforos' nightgown, robe, slippers and jewelry were still in the guest's bathroom. When Tarnower returned home, he went into the living room and read the papers. He then went upstairs to change for dinner. His guests, Debbie Raizes and Lynn Tryforos, arrived together about 7:00 P.M. Dinner was served by Henri and the meal was completed by approximately 8:00 P.M. After dinner, they all celebrated Mrs. van der Vreken's birthday with a cake that Tryforos had brought for the occasion. The weather was rainy and stormy, and the women left together at approximately 8:45 P.M. Some five minutes later Tarnower went upstairs to bed.

Mrs. van der Vreken testified that, ordinarily, when guests were expected at night, a light would be left on at the top of the outside steps. On the night of March 10, 1980, after the dinner guests had gone and Dr. Tarnower had retired to his bedroom, the lights on the steps were out.

Sometime later, Henri went to sleep. Mrs. van der Vreken, however, decided to paint and to watch television before going to bed. Suddenly, at approximately 10:45 or 11:00 P.M., she heard the buzzer on the kitchen telephone. The buzzer was a device by which Tarnower would generally contact the servants, using the attachment on his own telephone in his bedroom. Mrs. van der Vreken was surprised to hear the buzzer because it was late and Tarnower had never before called for her at that hour. As she walked toward the kitchen, she heard the buzzer a second time. She picked up the telephone and gave her usual salutation, "Doctor?". She repeated the word twice but received no answer. Instead, she heard the sound of yelling and she recognized Mrs. Harris' voice. She next heard some banging and then the sound of a shot. She never spoke to Dr. Tarnower again.

Mrs. van der Vreken ran into her husband's bedroom and told him that she had heard a shot and that Mrs. Harris was in the house. She suggested that they go upstairs because she knew that something was wrong. Henri cautioned that, since she had heard a shot, they had better call the police first. They tried to do so from the

kitchen telephone, but it would not work. Although there were several telephones in the house, there were only two separate lines. The van der Vrekens returned to Henri's room and used their private telephone to make several calls to the police.[2] Henri then ran out of the house to seek help from a neighbor. He saw a car, which he recognized as Mrs. Harris', pulling away. Mrs. van der Vreken saw the same thing from inside the house and noticed that the front door was now open.

Mrs. van der Vreken raced upstairs to Tarnower's bedroom and saw him kneeling between the two single beds in the room. The telephone receiver was near him on the floor. His pajamas were bloody and he had blood on his back. After Mrs. van der Vreken satisfied herself that the doctor was still alive, she ran downstairs to the telephone in her room to try to call for help. When she couldn't get through, she returned to the kitchen and saw Mrs. Harris coming up the steps with a police officer behind her. That officer was Patrolman Brian McKenna. He had been responding to a radio call which directed him to the Tarnower residence to investigate a possible burglary in progress. He received a subsequent transmission warning him of shots fired. On his way to Tarnower's house, he saw Mrs. Harris' car making a U-turn. He followed her back to the Tarnower residence and into the driveway. Mrs. Harris got out of the car and ran to the officer, telling him that the doctor had been shot, and urging him to hurry. McKenna followed Harris into the house and asked who had done the shooting. Mrs. van der Vreken responded that Mrs. Harris had.

McKenna, the two women, and Henri went up the stairs to Tarnower's bedroom. The room was in disarray with items of clothing, curlers and jewelry strewn about. Upon reaching the bedroom, McKenna saw Tarnower crouched on his knees leaning up against the headboard. There was a telephone on the floor immediately next to him, and he had blood all over his body. Checking Tarnower for vital signs and finding none, McKenna raced back to his vehicle, radioed headquarters for an ambulance, and returned to the bedroom with a resuscitator. Tarnower was placed on

---

2. Police records indicate that the first call was received at 10:57 P.M.

his back and McKenna began administering first aid to him. His efforts proved successful, as Tarnower resumed breathing.

As Tarnower lay on his back Mrs. Harris sat on the edge of one of the beds looking at him. She bent down, touched his face with the tip of her finger, and said, "Oh, Hy, why didn't you kill me?". Meanwhile, other officers were arriving on the scene and someone directed the women to go downstairs.

One of the first officers to respond to the Tarnower home was Detective Arthur Siciliano. When he entered the house, he encountered the two women standing in the foyer. He identified himself as a detective and asked what had happened. Harris said that the doctor had been shot. The detective asked where the doctor was. Harris replied that he was upstairs. The detective asked who did it, and Harris answered that she did. The detective then placed her under arrest and advised her of her constitutional rights. Harris responded that she would waive her rights and tell the detective what happened. The detective asked Harris where the gun was, and she said it was in her car. He accompanied her to the vehicle, and recovered a revolver from the front seat. The detective noticed a bloodstain on Mrs. Harris' blouse and a bruise on her lip. He asked her if she needed medical assistance and she replied that she did not.

The detective then asked Harris for a full account of the events of the evening. She told him that she had driven up from Virginia with the hope of being killed by Dr. Tarnower. She then hesitated a second and said, "He wanted to live, I wanted to die." She hesitated again and said, "I've been through so much hell with him, I loved him very much, he slept with every woman he could, and I had it". She then handed the detective a piece of paper containing a list of names. She said that she had recently prepared the list and that the people named were to be notified in the event that her wishes were carried out. She also stated that she had no intention of returning to Virginia alive.

Describing the events in the bedroom, Harris said that she and Tarnower had had a struggle and that the gun had

gone off several times. She said that she had asked Tarnower to kill her but that the doctor had said, "Get out of here, you're crazy." They started to struggle again, and the gun went off several times. She admitted that the gun was hers and said, "I remember holding the gun and shooting him in the hand." She did not know who had been in control of the weapon, however. Tears came to her eyes and she asked if she could see Dr. Tarnower. The detective replied that he did not think that that would be a good idea.

As Harris and the detective spoke, officers were bringing Dr. Tarnower down the stairs on a stretcher. When Harris saw Tarnower, she fell into the detective's arms and appeared to faint. The detective called for a doctor, but Harris immediately stood up as if nothing had happened and announced that she did not need a doctor. After Tarnower had been removed, Harris turned to Henri and in a loud voice asked him who had been there for dinner that evening. Henri directed his response to the officers. He asked them to remove Mrs. Harris from the premises as quickly as possible.

A few minutes later, Mrs. Harris spoke with Lieutenant Flick who had arrived at the scene. She told him that it was ironic that Dr. Tarnower was dying and that she was alive since it was he who wanted to live and she who wanted to die. Flick attempted to advise her of her constitutional rights, but she protested that she had already been given her rights three times. Flick then asked her if there was anyone she wanted to call, and she asked to call a lawyer friend in New York City. She obtained the number and was permitted to enter the kitchen to try to telephone the attorney. When she returned and said that she could not get through, Lieutenant Flick attempted to use the kitchen telephone to place the call. When he could not get through either, someone suggested that they use the telephone in the servants' quarters which was on a different line. Flick used that telephone to contact an attorney named Leslie Jacobson. He informed Jacobson that Harris had been involved in a shooting. Jacobson asked to speak with Mrs. Harris, and Flick returned to the foyer where Harris was seated with Officer Tamilio. Flick

told Harris that her party was on the line, and Tamilio then assisted her into the bedroom. She was handed the receiver, and Tamilio started backing away to the doorway of the room. Henri, however, remained seated on the bed, only some four or five feet from where Harris now sat.

Tamilio testified that, as he stood at the doorway, he heard Mrs. Harris say into the telephone, "Oh, my God, I think I've killed Hy."

When Harris completed her conversation with the attorney, Flick returned to the bedroom and spoke with him. After the telephone call, Mrs. Harris was escorted out of Henri's room. She passed an open door which led to a bathroom, and she stopped to look inside in the direction of a mirror. Touching her face in the area of her mouth she said as if speaking to herself, "He hit me, he hit me a lot."

Meanwhile, Dr. Tarnower was being rushed by police ambulance to St. Agnes Hospital. Dr. Roth, a police surgeon, rode with him. Sometime during the trip, Dr. Roth lost Dr. Tarnower's vital signs. His attempts to administer emergency aid were unsuccessful. At the hospital, attendants rushed Tarnower to surgery but the physicians were unable to revive him, and he was subsequently pronounced dead.

Mrs. Harris was driven to the Harrison police station where she was charged with assault. Two attorneys soon arrived and were given the opportunity to confer with her in private. Their conference was interrupted when an officer informed them that Tarnower had died and that the charge against Mrs. Harris would now be murder.

Police officers began examining the scene. They discovered bloodstains on the bed and two trails of blood apparently leading from Tarnower's bed to the bathroom and back. They also discovered a bullet hole in the glass door leading to the deck outside the bedroom, and later recovered a bullet fragment from a post on the deck. The clothing scattered around the room was gathered and seized, as was the bloodstained telephone and several cartridges found on the floor. A box of curlers was also lying on the floor, and there was jewelry thrown about. A bullet was discovered lodged in a headboard, and the bathtub in the guest bathroom was chipped.

The next day, Dr. Louis Roh performed an autopsy on Tarnower's body. He found four separate bullet wounds. One was to the right upper anterior chest wall. The bullet had fractured the medial end of the right clavicle and had perforated the right subclavian vein, continuing into the right chest cavity. The bullet did no further damage and was recovered in the chest cavity. The direction of the track was front to back, downward, and slightly right to left. Another wound appeared on the right posterior aspect of the shoulder. The bullet had entered the right chest cavity, fracturing three ribs. The fractures had caused the laceration of the pleural lining. The bullet had traveled in a downward trajectory on the surface of the lung causing a great deal of hemorrhaging in lung tissue. It continued downward, perforating the diaphragm and the front part of the right kidney where it was recovered. The direction of the bullet track was mainly downward, with a slight deviation from back to front and right to left. A third wound appeared on the right side of the right arm. The track extended through the tricep muscle and then into the right humerus. That bone was completely fractured and the bullet was recovered under the skin. A fourth wound was to the right hand with the entrance in the palm at the base of the right thumb. The track extended through the muscle tissue between the thumb and the index finger, exiting through the back of the hand.

It was determined that the cause of Tarnower's death was bullet wounds of the anterior chest wall, posterior aspect of the shoulder, the lung, the kidney, right arm and right hand.

It was later established that the bullets recovered from Tarnower's body and those found at the scene were all fired by the gun found in Mrs. Harris' car. When seized by the police, the weapon had a bent ejector rod and a broken hinge on the cylinder. The cylinder had one empty chamber and five spent cartridges. The weapon itself showed indications of blood.

The gun was a .32 calibre Harrington-Richardson Model 732, which Mrs. Harris had bought at a sports shop in Virginia in October, 1978. She had told the salesman that she was interested in purchasing a handgun for purposes of

self-defense, saying that she needed it because she lived in a rather secluded area. When first shown the gun, she looked at it "as if it were a strange object", leading the salesman to believe that she had no knowledge of handguns. After some indecision, she finally purchased the weapon that would later be used to take Herman Tarnower's life.

B. THE CASE FOR THE DEFENSE

As earlier noted, Mrs. Harris' position at trial was that her actions on the night of March 10, 1980, were not related to any fear of losing Dr. Tarnower's affections. She claimed that she had come to accept his desire and need for other women, and no longer felt threatened by it. Mrs. Harris maintained that she had suffered from an increasing sense of exhaustion and depression brought on by the burden of her duties as headmistress of the Madeira School. It was established that Dr. Tarnower had prescribed a variety of drugs to assist her in overcoming her feelings of exhaustion. Among these was Desoxyn, a methamphetamine which Mrs. Harris took regularly pursuant to Dr. Tarnower's prescription. Mrs. Harris testified that she had run out of the drug several days before the incident in question, and indeed, it was established that a new supply had arrived at the Madeira School on the day after Tarnower was shot.

Moreover, several witnesses testified that Mrs. Harris had demonstrated increased anxiety and depression as March 10 approached. It was established that, in the first week of March, 1980, she had returned from an exhausting fund-raising trip. Upon her return, she was met with the news of the discovery of drug paraphernalia in the dormitory rooms of four senior students who had held positions of trust in the student government. On March 6, Mrs. Harris chaired a meeting to determine what, if any, action should be taken against the offending students. At that meeting, she was subjected to severe criticism by certain segments of the student body. Nevertheless, she concurred in the judgment of the council and ordered the four girls expelled.

Apparently, this was merely one of a number of difficult episodes which had followed the shock of Mrs. Harris' discovery that members of Madeira's board of directors

were unhappy with her performance and that her administration of the school had been severely criticized in a report issued by an independent consultant. According to Mrs. Harris, the final straw came when she received a letter from one of her favorite students criticizing the disciplinary action she had taken against the four girls.

A succession of witnesses from Madeira confirmed that, following the expulsions, Mrs. Harris had been distracted, agitated, and unable to function in her normal manner. Many witnesses expressed great concern over her condition. They all seemed to show great affection and respect for her and, indeed, many were called specifically to attest to her high reputation for integrity, honesty, and peaceableness.

The crucial witness for the defense, however, was Mrs. Harris herself, for she not only described the stresses she felt and her resulting state of mind, but also recounted for the jury her version of how Dr. Tarnower had come to be shot and killed.

Mrs. Harris testified that she had met Dr. Tarnower at a party in December, 1966. They enjoyed each other's company and she soon fell in love with him. They shared many common interests, and traveled extensively together. Mrs. Harris also spent much time at Tarnower's home, which she grew to love as her own. In May, 1967, Tarnower asked her to marry him and gave her a large engagement ring. Sometime later, however, he reneged, telling her that he was married to his profession. She understood and did not believe marriage to be essential. The only thing that mattered to her was being with him.

As early as 1970, Mrs. Harris became aware that Tarnower was seeing other women. At one point, he actually told her that he was going to marry someone else, but she never seriously believed it. Thereafter, they continued their relationship, traveling around the world together and seeing each other almost every weekend from 1971 to 1975. Her only health related complaint during this time was her fear of running out of energy and she took medicine prescribed by Dr. Tarnower to prevent fatigue.

Mrs. Harris admitted that, on occasion, she had upsetting experiences regarding other women in Dr. Tarnower's life. Once when they were in Paris together, he received a letter from another woman. On the same trip, she noticed that the underside of Tarnower's cuff links were engraved with a message from Tryforos.

Sometime in May, 1979, a report was prepared by a consulting firm regarding the administration of the Madeira School. The report called Harris the most controversial head of any school in the country and recommended that the board fire her immediately. Mrs. Harris was traumatized, but the board of directors retained her as headmistress. Nevertheless, she was given two different versions of the board's vote on her retention and was left with the impression that she was on probation. All this made her realize that she would soon have to move on.

She spent the Christmas holidays in 1979 with Tarnower in Florida. Sometime later, she spoke with Suzanne van der Vreken about the details of a prewedding party for her son, David. Tarnower had asked her to arrange the affair directly with Suzanne. Mrs. Harris stayed at Tarnower's house for four days over the weekend of the party, spending each night with him in his bedroom. After the party, Mrs. Harris wrote to thank Tarnower for his generosity. Her note, which was read into evidence at trial, made unflattering references to Tryforos. It read in part: "[Y]ou will never be able to think of men and women as equals — but the truth is darling if one of the few women you do admire * * * were to adopt the male equivalent of Lynn as lover and richly rewarded 'boy Friday' you wouldn't ask them back to dinner a second time."

From February 24 to March 5, 1980, Mrs. Harris was on a fund-raising trip for the Madeira School. She made stops in Denver, Colorado Springs, San Diego, Seattle, San Francisco and Los Angeles, visiting schools, alumni and parents of prospective students. She felt extremely tired during the trip and took the medication prescribed by Dr. Tarnower. Upon her return, she was told that a basket full of drug paraphernalia and the remains of smoked marihuana had been found in the dormitory rooms of some senior students. Mrs. Harris confronted the girls and they admit-

ted that they owned the material. Harris then called a student council meeting, following the usual procedure for serious disciplinary problems. The meeting was held that night at Harris' house. She acted as chairman and opinions ran the gamut from demands that the girls be immediately expelled to pleas that expulsion was far too severe. The final vote was for expulsion, but Harris' concurrence was necessary for that action. She directed that the girls be expelled.

On Thursday, March 6, 1980, Mrs. Harris exhausted her supply of medication. Over the weekend she began to write a new will, and also wrote a long letter to Tarnower. On Monday, March 10, she completed the will and had it witnessed and notarized. She also mailed the letter to Tarnower that morning. The letter, which came to be known as the "Scarsdale Letter", contained several disparaging references to Lynn Tryforos..It also made reference to a dinner scheduled to be held on April 19, 1980, when Tarnower was to be honored by the Westchester Heart Association. Harris testified that although Tarnower had invited her to that affair, he felt that Tryforos should be there as well. According to Harris, Tarnower did not know precisely what to do about this dilemma. Harris had told him that she felt it was very important for her to be there and that she wanted to honor him.

Mrs. Harris testified that the so-called "Scarsdale Letter" accurately reflected her troubled state of mind when she wrote it, and she described it as "shrieking with [her] pain". The letter, which was introduced into evidence by the prosecutor during Mrs. Harris' cross-examination, stated that she was distraught over Tarnower's telephone message that he "preferred the company of a vicious, adulterous, psychotic". Mrs. Harris spoke of receiving a copy of Tarnower's will "with my name vigorously scratched out, and Lynn's name, in *your* handwriting written in three places, leaving her a quarter of a million dollars and her children $25,000 apiece — and the boys and me nothing." Mrs. Harris' letter continued, "[A]ll I ever asked for was to be with you — and when I left you to know when we would see each other again so there was something in life to look forward to. Now you are taking that

away from me too and I am unable to cope." Tryforos was variously described as "a thieving slut," "a psychotic whore," and a "sick playmate." Mrs. Harris referred to a book of epigrams which she had found on Tarnower's bed with a page marked dealing with "how an old man should have a young wife." Mrs. Harris wrote, "It made me feel like a piece of old discarded garbage — but at least it solved for me what had been a mystery — what had suddenly possessed you to start your tasteless diatribes at dinner parties about how every man should have a wife half his age plus 7 years. Since you never mentioned it to anyone under 65, it made the wives of *[sic]* the table feel about as attractive and wanted as I did." Mrs. Harris referred to a luncheon she had attended with the doctor at which Tarnower had discussed Lynn and her "wonderful family". Mrs. Harris observed, "I can't imagine going out to dinner with you and telling my dinner partner how grand another lover is." In another portion of the letter, Mrs. Harris wrote: "It would have been heartbreaking for me to have to see less and less of you even if it had been a decent woman who took my place. Going through the hell of the past few years has been bearable only because you were still there and I could be with you whenever I could get away from work, which seemed to be less and less. To be jeered at, and called 'old and pathetic' made me seriously consider borrowing $5,000 just before I left New York and telling a doctor to make me young again — to do anything but make me not feel like discarded trash — I lost my nerve because there was always the chance I'd end up uglier than before." Mrs. Harris continued, "You have been what you very carefully set out to be, Hi[3] — the most important thing in my life, the most important human being in my life and that will never change. You keep me in control by threatening me with banishment — an easy threat which you know I couldn't live with and so I stay home alone while you make love to someone who has almost totally destroyed me. I have been publicly humiliated again and again but not on the 19th of April. It is the apex of your career and I believe I have earned the right to watch it — if only from a dark corner near the kitchen." The letter

---

3. Apparently, Mrs. Harris would spell Tarnower's nickname "Hi" rather than "Hy".

concluded: "I would far rather be saved the trial of living without you than have the option of living with your money. Give her all the money she wants, Hi — but give me time with you and the privilege of sharing with you April 19th *** She has you every single moment in March. For Christ sake give me April — T.S. Eliot said it's the cruelest month — don't let it be, Hi. I want to spend every minute of it with you on weekends. In all these years you never spent my birthday with me. There aren't a lot left — it goes so quickly. I give you my word if you just aren't cruel I won't make you wretched. I never did until you were cruel — and then I just wasn't ready for it."

Mrs. Harris testified that, on Monday morning, March 10, she called Tarnower at his office. She told him that she had sent him a letter and she asked him to throw it away without reading it because she regretted having mailed it. She testified further that they then spoke of a number of things, and Tarnower invited her to come to Westchester on the weekend of April 5.

Later that day, Mrs. Harris received a letter from a student who had once been injured in a hazing accident at the school. After the accident, Mrs. Harris developed a strong affection for the girl, and the two had enjoyed a close relationship ever since. The letter was critical of Harris' handling of the disciplinary affair, and that criticism affected her deeply. She thought, "if she thinks I failed her, too, I had really blown the whole thing."

Mrs. Harris testified that this letter, combined with all that had preceded it, persuaded her that she could no longer function. It was then that she decided to take her own life.

She wrote several letters and notes, including one to the chairman of Madeira's board of directors in which she said "next time choose a head the Board wants and supports. Don't let some poor fool work like hell for 2 years before she knows she wasn't wanted in the first place." In a second note, she wrote, "I wish to be immediately cremated and thrown away."

Mrs. Harris began thinking about the walks she had taken with Tarnower on the grounds of his estate. She

thought particularly of the pond, and she remembered that Tarnower had once said that, when he died, he wanted to be cremated and have his ashes sprinkled on that pond. She thought that she too would like to die by the side of the pond where daffodils grew in the spring, and she decided that there was where she would go.

Before she left Madeira, she called Tarnower. He answered and she said, "Hy, it's been a bad few weeks and I'd like to come and talk to you for a few minutes." He told her that Debbie was coming for dinner that night, but she replied that that didn't matter because Debbie always left early and she couldn't get there before 10:30. He said that it would be more convenient if she came the next day, but she insisted, saying, "Hy, please, just this once let me say when." He replied, "Suit yourself." Mrs. Harris then made preparations to leave.

She took out the gun she had bought a year before, put a bullet in it, and took it out to her terrace. She pulled the trigger a number of times and, on the third or fourth attempt, the gun fired. She brought the gun back into the kitchen and poked out the spent cartridge with an ice pick. She then took several bullets and tried to fill each chamber of the cylinder because she did not want to play "Russian roulette" when she shot herself later. She thought she had filled the gun completely, and only later learned that she had put only five rounds in the cylinder. She also put a number of bullets in her coat pocket.

She then left her house to begin the journey. When she got to her car, she found a bouquet of flowers on the seat which had been placed there earlier by a teacher who was concerned about her condition. Mrs. Harris entered her vehicle, filled it with gas, and left. She intended to see Tarnower one more time before dying.

For the most part, Mrs. Harris had a peaceful trip, content with "the knowledge that [she] finally had come to the end of the road". At trial, she described her arrival at Tarnower's home and the ensuing events as follows:

"I stopped right in front of the front steps and I was sort of surprised not to see a light on, but I thought, well, maybe he left the door ajar and didn't want to leave a light on. So I

got out of the car and started up the steps, and then I remembered the flowers and I thought it would be nice to take him the flowers. So I went back and opened up the other side of the car and I reached in for the flowers and I had put them on top of my pocketbook and I picked up my pocketbook, too, and the flowers, and I closed the door and walked up the steps to the front door and it was locked * * *

"I walked up the stairs and tried the doors and it [sic] was locked. So I just walked back downstairs and went in the way we usually went in, anyway, which was through the garage. I opened the garage door on the right-hand side, the one where Henri and Suzanne had their car, and then I walked around in back of Hy's car and I pushed the button for his door in order to make the light go on, so I could see what I was doing, and then I walked up to the first floor, and it was all dark there and quiet, and then I called to Hy from the bottom of the stairs and then walked upstairs * * *

"I just called, 'Hy, Hy,' and I walked upstairs and he was just beginning to stir when I got to the top of the stairs * * *

"I heard Hy just stirring and I walked over and sat on the edge of my bed and reached over and turned on the light, and the light over his bed went on * * *

"Well, Hy was just waking up and rubbing his eyes and I said, 'Hi. I thought you would leave a lamp in the window, it's black as pitch out there,' and he was not enthralled to see me and he said, 'Jesus, it's the middle of the night,' * * * and I said, 'It's not really that late and I'm not going to stay very long. I just came for a while to talk with you,' and he said 'Well, I'm not going to talk to anybody in the middle of the night,' and he turned toward me. He always had two pillows on his bed and he was lying on one and hugging the other one and he said, 'I don't feel like talking in the middle of the night', and he closed his eyes. So I sat for a minute thinking he would wake up. He usually woke up very quickly, because he was used to phone calls in the middle of the night and getting up and getting dressed and racing out to a patient very fast, but he didn't seem

inclined to wake up very fast that night, and I finally said, 'I brought you some flowers.' He didn't answer. And I said, after I waited a little while, 'Have you written any more on the book?' and he said, 'Jesus, Jean, shut up and go to bed,' and I said, 'I can't go to bed, dear, I'm not going to stay that long, I'm just going to be a little while', and I sat a while longer and he lay there hugging the pillow with his eyes closed, and I finally said, 'Won't you really talk to me for just a little while?' and he didn't answer, and I sat some more, and finally I said — I didn't want to leave yet. I was sure he would wake up and stick the other pillow in the back of his head and say, 'You're some kind of a nut to drive five hours in the middle of the night to talk, but what do you want to talk about?' So I was just kind of waiting."

Mrs. Harris then turned on the light and went into the guest bathroom. She saw a number of things, one of them a greenish blue satin negligee. The negligee was not hers. Mrs. Harris' account continued:

"I took it off the hook where it was hanging and I walked into Hy's room and threw it on the floor. And Hy was still paying no attention. I thought I saw the negligee land on the floor. I don't know. I went back in the bathroom. By this time I felt hurt and frustrated, because the script wasn't working out the way I expected it to. I had looked forward to a few more minutes with Hy and I guess I wanted to feel safe one more time and I thought it was a reasonable request, but it wasn't happening, and I walked back into the bathroom and I picked up a box of curlers and threw them. I really didn't know where they landed. I just threw them in the bathroom, I thought, but I guess they went out into the dressing room, and I heard the noise. They apparently broke a window, though I didn't know until many months later that they had broken a window, and as I walked out of the bathroom Hy was standing at the door and his arms swung out and he hit me across the face * * *

"My first reaction was to want to throw something else. So I turned around and went back into the bathroom and picked up something. I didn't know until I was told in this courtroom what it was. But I picked up a box and threw that, too. I threw that and it went into a cosmetic bureau of

mine and smashed that and then scattered around on the floor."

Tarnower struck her again, and the blow seemed to have a sobering effect:

"I didn't have any desire to throw any more things. It just hadn't turned out the way I thought it would, and I simply wanted to get dying over with. The pleasant talk was not to be. So I calmed down and I walked in and I sat on the edge of my bed facing away from his and I put my hair behind my ears and I raised my face to him and I closed my eyes and said 'Hit me again, Hy, make it hard enough to kill' * * *

"He didn't say anything. He stopped in front of me for an instant, I guess. It was long enough, so I wondered how much it would hurt if he did it, but he didn't touch me again. He walked away, and he probably took a great deal of self-control, because I am sure he was very mad by then. But he didn't hit me again. He didn't say anything. He just walked away around my bed and over to somewhere near his bed. I never really saw exactly where he was standing right at that moment, and it was very quiet, and I got up, I think to go, and I walked around the foot of the bed and I picked up my pocketbook and I felt the gun and I unzipped the bag and took out the gun and I said, 'Never mind, I'll do it myself,' and I raised it to my head and pulled the trigger at the instant that Hy came at me and grabbed the gun and pushed my hand away from my head and pushed it down, and I heard the gun explode. It was very loud. It seemed very loud, because I didn't think I'd hear it, and Hy jumped back and I jumped back and he held up his hand and it was bleeding and I could see the bullet hole in it and he said, 'Jesus Christ, look what you did,' and we both just stood there and looked at it. I think he was as appalled as I was. I wasn't aiming the gun at Hy and I didn't even know he was looking at me, but he moved very fast and he was the one who was shot, and he stood and looked at it * * *

"He sort of stared at the hand for a minute and then he turned and went into the bathroom, and I stood there for a little while. I didn't have I don't think exactly a normal reaction to it, because I couldn't believe it had happened.

Ordinarily if he sounded hoarse, I was upset if he didn't take a pill, but I didn't feel — I didn't rush to help him. I stood there and stared at him, and then I followed him into the bathroom, or I started following him into the bathroom * * *

"I got about half-way around Hy's bed and I suddenly realized that the gun was still in here, and if I went back and got it fast enough, I could shoot myself before Hy — I could hear the water running and I thought I could get it over with before he even came back into the room. So I didn't go all the way into the bathroom with him. I turned around and went back and I looked at the foot of the bed and I didn't see the gun and I looked in between the beds and I didn't see it, and I got down on my knees and looked under my bed and it was there, and I reached under to get it. I was on my knees, down low, and I pulled it out, and as I pulled it out, Hy came out of the bathroom — I didn't actually see him at that moment. I didn't realize what he was doing until I could feel him, and I think he just flew over the bottom of the bed and he grabbed my left arm and he held it, very, very tightly. and it hurt, and it made me drop the gun * * *

"He picked up the gun. He held on to my arm for a while and he picked up the gun and then he got up and he walked over and sat on the ledge of his bed next to the little ledge where the telephone was and the buzzer and I was on my knees and looked at him and he looked at me and I came over in front of him — I don't think I got all the way up, I was kneeling in front of him and he buzzed the buzzer. He buzzed it several times * * *

"And I came over to him and I was on my knees. From the time he first buzzed the buzzer I was panicked, because I was afraid Henri and Suzanne would come running up the steps any minute, and I said, 'Hy, please give me the gun, please give me the gun, or shoot me yourself but for Christ sake let me die,' and he looked at me and said, 'Jesus, you're crazy, get out of here,' and he pushed me aside and reached for the phone, because once you buzz the buzzer you have to pick up the phone and talk to someone on one of the other phones * * *

"I pulled myself up on his knees, as a matter of fact, just holding on to them, and I was just about straight, and the gun was there. He wasn't holding it then. I think he put it on his lap by then. That's where I remember reaching for it, and as I got up, I grabbed for the gun and Hy dropped the phone and he grabbed my wrist and I pulled back and he let go and I went back on the other bed. I fell back the way you would in a tug of war and Hy lunged forward at me, as though he were going to tackle me, and his hands came out like that, around my waist, and there was an instant where I felt the muzzle of the gun in my stomach. I thought it was the muzzle of the gun, and I had the gun in my hand and I pulled the trigger and it exploded again, with such a loud sound, and my first thought was: my God, that didn't hurt at all, I should have done it a long time ago. And then Hy fell back and I got up and ran."

Mrs. Harris testified that she stopped at the head of the bed near the closet and put the gun to her head. She took a deep breath and pulled the trigger, but the gun did not fire. She examined the weapon, holding it downward. She pulled the trigger again and the gun fired. She then put the weapon back to her head and pulled the trigger repeatedly, but the gun "just clicked". Mrs. Harris decided to reload the weapon and she looked for the bullets she had carried with her in the pocket of her coat. Although she found them, she could not load them into the gun because she was unable to empty the cylinder of the spent cartridges. She tried banging the gun on the tub but she could not dislodge the cartridges. Instead, she managed only to break the cylinder of the weapon. When she realized that the gun was now inoperable, she walked back into Tarnower's room and saw him drop the receiver of the telephone. He then turned and was pulling himself up onto the bed. Mrs. Harris picked up the telephone but heard no dial tone. She replaced the receiver and said, "Hy, it's broken. I think it's gone dead." Tarnower responded, "You're probably right." That was the last thing Mrs. Harris ever heard him say.

Mrs. Harris helped the doctor onto the bed. He looked exhausted, but did not appear to be in grave condition. Mrs. Harris ran downstairs and to the front door, calling to Mrs. van der Vreken that she was going for help. She got

into her car and drove toward a nearby community center where she knew there was a public telephone. On the way she saw a police car with flashing lights. She turned her own car around and headed back toward Tarnower's residence. The patrol car followed.

When they pulled up in front of the house, Mrs. Harris ran to the patrol car and urged the patrolman to hurry. As they ran up the steps they encountered Henri and Suzanne. Henri was screaming hysterically, "She's the one, she did it, she's the one." They all then went up to Tarnower's bedroom.

Suzanne knelt on the floor beside the doctor, taking his hand and speaking softly to him. Mrs. Harris then lay across the bed and caressed his face. She said, "Oh, Hy, why didn't you kill me?" Mrs. Harris observed that Tarnower "was trying to talk to us then, too, but he couldn't speak, and not three minutes before he spoke perfectly clearly."

At trial, Mrs. Harris insisted that she believed that she had only shot Tarnower in the hand and had said so to Detective Siciliano. She claimed that, contrary to the testimony of prosecution witnesses, there was very little blood near Tarnower and that only his hand was bleeding.

On cross-examination, Mrs. Harris strenuously denied that, during her telephone conversation with Tarnower on the morning of March 10, 1980, he had accused her of lying and cheating. She further denied that he had told her that she was going to inherit $240,000. Finally she denied that Tarnower had said to her, "God damn it Jean, I want you to stop bothering me."

C. THE PEOPLE'S REBUTTAL

In its rebuttal case, the prosecution called Mrs. Juanita Edwards. Mrs. Edwards testified that she had had an appointment with Tarnower at 10:00 A.M. on Monday, March 10, 1980. Upon her arrival at Tarnower's office, she was shown directly into an examining room which had a wall telephone. Tarnower had just started examining her when the telephone rang. He answered it and then said, "I'll take this call in my office." He placed the receiver on a bracket near the telephone and left the room without

severing the connection. Mrs. Edwards remained seated on the examining table and soon became aware of muffled voices coming through the receiver. She recognized one voice as Dr. Tarnower's and heard him say loudly, "God-damn it, Jean, I want you to stop bothering me." The voices then became muffled again until Mrs. Edwards heard Dr. Tarnower say, "You've lied and you've cheated." Later, she heard Tarnower say, "Well, you're going to inherit $240,000." Thereafter, Tarnower returned to the examining room, replaced the receiver on the hook, and continued Mrs. Edwards' examination.

### D. THE EXPERT TESTIMONY

An extraordinary amount of expert testimony was offered at trial on a variety of subjects. The major dispute turned out to be whether the bullet which entered and exited Dr. Tarnower's hand went on to cause his chest wound. The People contended that it did and that that fact would suggest that the injury to Tarnower's hand was a "defensive wound". The defense argued that the hand and chest wounds had been caused by two separate bullets. Opinions were offered in support of the prosecution's theory, and in contradiction to it, largely depending upon whether the particular expert was able to discern in the slides of the chest wound evidence of cells which were peculiar to the palmar surface of the hand. There was also conflicting testimony as to whether the wounds inflicted upon Dr. Tarnower were consistent with a struggle between someone of his size and someone of the size of Mrs. Harris. In addition, there was testimony indicating that a wound, presumably one of those inflicted upon Dr. Tarnower, had been in contact with the weapon.

To support her version of the shooting, Mrs. Harris called Herbert Leon MacDonell, the director of the Laboratory of Forensic Science and an adjunct professor of criminalistics at Corning Community College and at Elmira College. Professor MacDonell, a noted consultant in criminal cases, has special expertise in blood splatter analysis. MacDonell took measurements and examined the scene in an attempt to reconstruct the position from which each bullet was fired. Based upon his analysis of the blood splatters, he concluded that, after having been wounded,

Tarnower probably walked from the bed to the bathroom and back to the bed. He also was of the opinion that four of the five spent cartridges found in the cylinder of the weapon had been double struck by the hammer. This fact, coupled with the position of the cylinder when the gun was recovered, led MacDonell to offer the following sequence: the weapon was fired four times; the hammer then fell on the empty chamber; the gun was then fired one more time; and the trigger was pulled either four or five additional times, with the hammer falling on spent cartridges and possibly again on the empty chamber. MacDonell also concluded that the shot to Tarnower's hand was not the final shot.

Additionally, the defense called two psychiatrists to testify as to the effect of the sudden discontinuance of Desoxyn. Both agreed that a woman like Jean Harris, who had suddenly discontinued the use of the drug at the level at which she was taking it, would be expected to experience fatigue, anxiety, agitation, a sense of melancholy, and a tendency to feel pessimistic and easily overwhelmed by day to day stress.

At the close of evidence, in addition to the charges contained in the indictment, the defendant asked only that the lesser included offense of criminal possession of a weapon in the fourth degree be submitted to the jurors, this in the hope that they would find that Mrs. Harris' uncontroverted possession of the weapon had occurred in her "home." The prosecutor asked for the submission of manslaughter in the first degree, arguing that the jury could find an intent to cause serious physical injury rather than an intent to kill. The defendant objected, and the court denied the application. However, over the defendant's objection, the court granted the prosecutor's request to charge manslaughter in the second degree (reckless homicide) and, once that request was granted, the defendant asked for and received a charge on the lesser offense of criminally negligent homicide.[4]

---

4. Notwithstanding the substantial evidence of Mrs. Harris' distress and anxiety prior to and at the moment of the shooting, she deliberately chose not to have the jury consider the mitigating defense of extreme emotional disturbance (Penal Law, § 125.25, subd 1, par [a]) — this, although the Trial Judge had suggested that such a charge would be an appropriate option.

After lengthy deliberations, the jury convicted Mrs. Harris of murder in the second degree, criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree.

DETERMINATION ON APPEAL

Mrs. Harris begins her attack upon her conviction with a challenge directed at the trial court's refusal to excuse juror Marie West. During jury selection, Mrs. West revealed at side bar that one of her daughters had been arrested for a "flimflam" in Westchester County. She had hired a lawyer and, as far as Mrs. West knew, her daughter had appeared before a Grand Jury which had refused to indict her. Notwithstanding this revelation, Mrs. West was accepted by both sides and was sworn as a juror.

A week later, before a full jury had been selected, a conference was held in chambers. Assistant District Attorney Thomas Lalla, who was assigned to assist Prosecutor Bolen at trial and who had not been present at the earlier Bench conference, revealed that he had played a part in the dismissal of the case against Mrs. West's daughter. Mr. Lalla stated that, after he had learned of the substance of the Bench conference, he had checked his records and had discovered that the daughter had in fact been indicted but that thereafter the alleged victims of her offense had been unable to identify her. After she had submitted an alibi notice and had taken a lie detector test, Mr. Lalla had moved for the dismissal of the indictment in the interests of justice. Defense counsel thereupon asked for time to decide whether this information would affect his assessment of Mrs. West's impartiality.

The following Monday, counsel moved to have Mrs. West excused as a juror. He challenged her for cause and, in the alternative, offered to exercise a peremptory challenge against her. The court denied the application because it was satisfied that there was no prejudice to the defense. The court stated that "under all of the circumstances there is not sufficient cause for me to withdraw the Juror and allow [defense counsel] to challenge for cause or peremptorily Mrs. West as a sworn Juror." Defendant

contends that the court's failure to excuse Mrs. West constitutes reversible error. We disagree.

We begin by restating what is the preferred policy in this State. As our Court of Appeals has said, "[T]he trial court should lean toward disqualifying a prospective juror of dubious impartiality, rather than testing the bounds of discretion by permitting such a juror to serve. It is precisely for this reason that so many veniremen are made available for jury service." *(People v Branch,* 46 NY2d 645, 651-652; see, also, *People v Provenzano,* 50 NY2d 420, 425.)

This court has repeatedly issued a similar caution. (See, e.g., *People v Sellers,* 73 AD2d 697; *People v Moorer,* 77 AD2d 575, 577.) The same policy has been held applicable to cases involving sworn jurors although, where a challenge is directed at a sitting juror, the burden upon the moving party is somewhat greater. (See *People v Meyer,* 78 AD2d 662, 664.) By failing to excuse Mrs. West, the Trial Judge here risked placing an eventual conviction in jeopardy. Nevertheless, we cannot conclude that he committed error.

The Criminal Procedure Law sections which control jury selection and which are pertinent to the issue at bar, provide in relevant part:

"§ 270.15 Trial jury; examination of prospective jurors; challenges generally * * * ˉ

"2. Upon the completion of [examination of a juror] by both parties, each, commencing with the people, may challenge a prospective juror for cause * * * After both parties have had an opportunity to challenge for cause, the court must permit them to peremptorily challenge any remaining prospective juror * * * The prospective jurors who are not excluded from service must retain their place in the jury box and must be immediately sworn as trial jurors * * *

"4. A challenge for cause of a prospective juror which is not made before he is sworn as a trial juror shall be deemed to have been waived, except that such a challenge based upon a ground not known to the challenging party at that time may be made at any time before a witness is sworn at the trial."

"§ 270.20 Trial jury; challenge for cause of an individual juror

"1. A challenge for cause is an objection to a prospective juror and may be made only on the ground that * * *

"(c) * * * he bears some other relationship to [counsel] of such nature that it is likely to preclude him from rendering an impartial verdict".

These statutes make no provision for a peremptory challenge of a sworn juror. And it has long been held that a defendant's rights are not impaired when he is precluded from challenging a sitting juror peremptorily. (See *People v Carpenter,* 102 NY 238, 248; see, also, *People v Mancuso,* 26 AD2d 292, 294.)

Mrs. Harris, however, cites *People v West* (38 AD2d 548, affd 32 NY2d 944) for the proposition that a peremptory challenge of a sworn juror is permissible. In *West,* during *voir dire,* a prospective juror assured the parties that he would not be prejudiced by the fact that the defendants may be shown to have been members of the Black Panther Party. After he had been sworn, the juror voluntarily came forward and revealed that he had participated in a demonstration at the courthouse in support of lower bail for the "Panther Twenty-one" and had signed petitions to that effect. He insisted, however, that he would be a fair and impartial juror. An Assistant District Attorney stated under oath that, had he known of the juror's activities, he would have exercised a peremptory challenge against him. His motion to excuse for cause was denied, and he then asked to exercise a peremptory challenge. The Trial Judge granted the application stating: "I have ruled on this under 371 of the Code that this juror although previously sworn *for good cause* is being excused on the exercise of peremptory challenge by the People".

Section 371 of the Code of Criminal Procedure, the former statute controlling challenges to sitting jurors, empowered the court to excuse a juror, although sworn, for good cause. In *West,* the Appellate Division, First Department, upheld the defendant's conviction noting (p 549) that "[w]hether the 'good cause' determination was triggered by the peremptory challenge or whether there was a mere

inartistic wording of the disposition of the challenge without a determination of 'good cause' may be debatable." Nevertheless, the court observed (p 549): "The information volunteered by [the juror] might reasonably be construed as indicating that he did not possess the requisite indifference."

We read the Appellate Division's decision in *West* as holding that, within the meaning of the then applicable statute, there had been "good cause" for the disqualification of the juror. Significantly, in a later case decided under the Criminal Procedure Law, this court had occasion to label as "gross error", a trial court's grant of a prosecutor's peremptory challenge directed against a sworn juror. (See *People v Chmarzewski,* 51 AD2d 554, 555.)

We conclude, therefore, that under the Criminal Procedure Law, a sworn juror may be challenged only for cause and not peremptorily. We turn then to the question of whether Mrs. West was vulnerable to such a challenge. Under the circumstances at bar, that question must necessarily turn on whether facts revealed *after Mrs. West was sworn as a juror* demonstrated that she bore some relationship to the prosecutors which was of such nature that it was likely to preclude her from rendering an impartial verdict.

In *People v Culhane* (33 NY2d 90), the Court of Appeals noted that, as compared to the former Code, the Criminal Procedure Law gives a Trial Judge greater flexibility and an increased responsibility in determining which potential jurors should be excused for cause. The court then offered illustrations of cases in which such a disqualification would be appropriate. A challenge for cause would lie, for example, where the prospective juror was a correction officer and the defendant was a convict charged with murdering a Deputy Sheriff *(People v Culhane, supra)* or where the potential juror was a Police Commissioner and the case involved the shooting of a police officer *(Commonwealth v Colon,* 223 Pa Super Ct 202), or where the prospective juror was related to a taxidriver, in a case involving a murder of a taxidriver *(Sims v United States,* 405 F2d 1381). (See *People v Culhane, supra,* at p 104, n 2.)

Later, in *People v Branch* (46 NY2d 645, *supra),* the denial of a challenge for cause was held to be error where the prospective juror revealed that he was serving as a part-time police officer in a town located in the county of prosecution, that he had worked with the county District Attorney's office and, in some cases, had worked closely with the State's trial attorney, and that he had developed a personal relationship with that attorney. And, in *People v Sellers* (73 AD2d 697, *supra),* we held it to be error for the trial court to have denied a robbery defendant's challenges for cause directed against a customs officer whose duties included the enforcement of law through making arrests, and against a woman whose son had been robbed and whose husband had been the victim of a knife-point mugging. On the other hand, the Court of Appeals upheld the denial of a challenge for cause directed against a prospective juror who revealed that she had met the trial prosecutor at several political rallies, that both were members of the same local political club, and that she had campaigned for the prosecutor in his race for election as part of her efforts for her party's ticket. *(People v Provenzano,* 50 NY2d 420, *supra.)* The question, then, of whether a prospective juror has the kind of relationship which falls within the scope of the statute is not always easy to resolve. In the case at bar, however, we are not called upon to examine any such relationship, for we conclude that the record demonstrates no relationship at all.

It is important at the outset to distinguish between the relevant and irrelevant factors in Mrs. West's background. It is entirely immaterial that Mrs. West's daughter was once arrested for an offense in Westchester County or that she had appeared with an attorney in the very courthouse in which the instant trial was to be held. Those facts were all known to defense counsel during the *voir dire* at a time when Mrs. West was subject to challenge. No such challenge was made, however, and she was accepted by both sides and sworn. What was unknown to the defense at that time, and what therefore constitutes the only relevant information here, is that Mrs. West's daughter had been indicted for the offense and that her case had been dismissed, not simply by the office of the District Attorney,

but on the motion of the very prosecutor who was assisting in the Harris case.

As previously indicated, the controlling statutes permit a challenge for cause only where there is "some * * * relationship * * * of such nature that it is likely to preclude [the prospective juror] from rendering an impartial verdict". (CPL 270.20, subd 1, par [c].) In our view, it is self-evident that such a relationship cannot exist unless the juror is aware of it. There is no indication in the record here that Mrs. West knew that Mr. Lalla had moved to dismiss her daughter's case or, indeed, that the District Attorney's office had played any role in that dismissal. Nor is there any suggestion before us that Mrs. West did have such knowledge but deliberately withheld it. (Cf. *People v Howard,* 66 AD2d 670.) Thus, there is no showing of a relationship within the meaning of the statute. Significantly, after Mr. Lalla made his revelation, defense counsel never asked for a further examination of the juror to determine, for example, whether she was in contact with her daughter and thereby might learn of Mr. Lalla's part in the dismissal.

Moreover, the defendant's present claim of prejudice seems to contradict her counsel's earlier view. As the trial progressed and as it became evident that it would extend over the Christmas holidays, several jurors expressed unhappiness because of the threat to travel plans they had previously made. The Trial Judge expressed a willingness to substitute an alternate juror if that became necessary. The substitution was avoided when an adjournment was declared covering the period in question. The adjournment was granted after, *inter alia,* defense counsel objected to any substitution, saying, "[W]e have chosen a jury and I would like to try the case before the twelve people we have chosen." One of the jurors who had complained about conflicting travel plans was Marie West.

In sum, we conclude that a sworn juror is not subject to a peremptory challenge under the Criminal Procedure Law. We further conclude, that since there is a total absence of any indication in the record that Mrs. West had knowledge of the prosecutor's role in the dismissal of her daughter's case, she was not vulnerable to a challenge for cause. We

therefore hold that the Trial Judge did not err in refusing to exclude her from the jury. (See *People v Sumpter,* 82 AD2d 869.)

We consider next the defendant's contention that she was deprived of a fair trial when the court denied her application for an order permitting her to inspect the Tarnower residence.

Mrs. Harris was represented by counsel in this case before Dr. Tarnower was pronounced dead. Indeed, two attorneys met her in the early morning of March 11, 1980, at the Harrison Police Station. Nevertheless, her omnibus motion, containing a request for "a physical inspection of the Tarnower house", was not made until May 27, 1980, some 60 days after her arraignment. Thus, not only was her request less than prompt, it was actually untimely and was subject to summary denial. (See *People v Selby,* 43 NY2d 791; CPL 240.80, 255.20, subd 1.) The court nevertheless considered the application and denied it "without prejudice to the defendant's making such a request to the executor of the estate of the deceased or to whomever has title to such property."

■ The defendant contends that the court's denial of her application for an inspection was predicated on a statute which was no longer in effect, and that the applicable statute empowered the court to grant the request. The defendant argues further that the failure to permit her to inspect the premises was grievous error, resulting in the loss or destruction of evidence which would have supported her position at trial. Whatever the merits of her attack on the court's ruling, the defendant plainly suffered no prejudice thereby.

There is no indication that defense experts were ever refused access to the Tarnower home after the defendant's motion was denied. Indeed, the record is replete with testimony establishing that those experts, as well as Mrs. Harris herself, were permitted to visit the home on several occasions and to conduct tests in the bedroom in which Dr. Tarnower was shot.

Moreover, the cases upon which the defendant relies are clearly inapposite, for they deal with the intentional de-

struction or negligent loss of evidence by agents of the government. (See, e.g., *United States v Bryant,* 439 F2d 642 [government loss of tape recordings of motel room conversations between defendants and an undercover agent allegedly concerning the sale of narcotics]; *United States v Miranda,* 526 F2d 1319 [loss by government agents of a tape recording of a conversation between the defendant and an informant]; *United States v Picariello,* 568 F2d 222 [destruction of dynamite by Massachusetts authorities four months prior to the trial of a defendant accused of unlawfully transporting explosives in interstate commerce]; *United States v Pollock,* 417 F Supp 1332 [intentional destruction of notes of a Drug Enforcement Administration officer after they had been subpoenaed by a defendant who contended that he had been working as an undercover agent].) There is no suggestion in the case at bar that any property was intentionally destroyed by police. Instead, the claim appears to be that the authorities did not preserve certain evidence for a sufficient length of time to permit the defendant's experts to examine it. However, it would seem that, at least in major part, the defendant is a victim of her own tardiness.

For example, the rug in the bedroom, which the defense claims demonstrated that Dr. Tarnower had walked to the bathroom and back to the bed after having been shot in the hand, was not disposed of until two months after the shooting. The rug was retained at the house for that period at the request of the police who had photographed it. Significantly, Professor MacDonell, the witness whose testimony primarily concerned analysis of crime-scene evidence, was not retained by the defense until almost six months after the shooting. Finally, we note that there is no evidence that any representative of the defense ever made a request to the police or to the District Attorney's office to preserve any particular items of evidence. (Cf. *People v Emmons,* 99 Misc 2d 941.)

The defendant next contends that she was deprived of a fair trial when the court received Mrs. Edwards' testimony in rebuttal. The defendant maintains that this testimony was offered to prove criminal intent, and therefore should have been presented as part of the People's case-in-chief.

The People respond that the trial prosecutor had determined that Mrs. Edwards' testimony was inadmissible in his direct case because he could not show that Mrs. Harris had actually been a party to the overheard telephone conversation.

The prosecution did possess evidence that a telephone, available to Mrs. Harris at the Madeira School, was used to place a call to Dr. Tarnower's office at approximately the time at which Mrs. Edwards claims to have overheard the conversation. In addition, Mrs. Edwards testified that she heard Tarnower use the name, "Jean". Nevertheless, having never met Mrs. Harris, Mrs. Edwards was unfamiliar with her voice. Moreover, she testified that the caller's voice sounded muffled and indistinct.

■ Significantly, the People rested without calling Mrs. Edwards to the stand and before learning that Mrs. Harris would testify on her own behalf. Thus, had Mrs. Harris not taken the stand, the prosecution would have lost forever Mrs. Edwards' testimony. Once Mrs. Harris chose to testify, of course, her testimony regarding the telephone conversation was a sufficient predicate to support the admissibility of Mrs. Edwards' testimony.

The question of authentication of a telephone conversation is a difficult one where the witness is unable to testify to a recognition of the caller's voice. In *Mankes v Fishman* (163 App Div 789, 795), the court observed that: "the identity of [a party to a telephone conversation] may be established by means other than the recognition of the voice * * * and a conversation otherwise admissible is properly received in evidence when from all the circumstances the identity of the [party] has been established with reasonable certainty."

More recently, in *People v Lynes* (49 NY2d 286, 292), the Court of Appeals wrote that: "while in each case the issue is one to be decided upon its own peculiar facts, in the first instance the Judge who presides over the trial must determine that the proffered proof permits the drawing of inferences which make it improbable that the caller's voice belongs to anyone other than the purported caller". (See, also, *People v McKane,* 143 NY 455, 474; *Ottida, Inc. v*

*Harriman Nat. Bank & Trust Co. of City of N.Y.,* 260 App Div 1008; *Van Riper v United States,* 13 F2d 961, 968, cert den *sub nom. Ackerson v United States,* 273 US 702.)

Whether, in the case at bar, there was sufficient evidence to authenticate the telephone conversation and thereby to permit Mrs. Edwards' testimony to be received in the People's direct case presents a close question. We need not resolve the issue, however, because we hold that, in any event, Mrs. Edwards' testimony was proper rebuttal evidence.

The general rule is that "[r]ebutting evidence * * * means, not merely evidence which contradicts the witnesses on the opposite side and corroborates those of the party who began, but evidence in denial of some affirmative fact which the answering party has endeavored to prove." *(Marshall v Davies,* 78 NY 414, 420.) Thus, for example, where a defendant offers an alibi defense, the People may not offer evidence in rebuttal which merely places the defendant at the scene of the crime. Although such proof clearly contradicts the alibi, evidence of the defendant's presence at the scene of the crime is a necessary part of the People's direct case, and, thus, is improper rebuttal. In contrast, proper rebuttal evidence in an alibi case would be proof demonstrating that the defendant was not where he claims to have been. (See, e.g., *People v Baylis,* 75 Misc 2d 397; *People v Olsen,* 100 Misc 2d 947; see, also, *People v Richardson,* 25 AD2d 221.)

As the defendant correctly contends, intent to kill is a necessary element for a conviction of the crime of murder, and therefore must be proved by the prosecution on its direct case. Contrary to the defendant's view, however, Mrs. Edwards' testimony did not in truth tend to establish Mrs. Harris' intent to kill. Indeed, she heard nothing said by Mrs. Harris at all, and Dr. Tarnower's statements did not suggest that he was in any danger. Rather, the relevance of Mrs. Edwards' testimony lay in its tendency to *disprove* the alternative state of mind proffered by the defendant at trial.

Mrs. Harris did not simply deny having had an intent to kill Dr. Tarnower; she presented evidence of an alternative "state of mind". She insisted that she had been intent on

taking her own life, and claimed to have been motivated by her feelings of inadequacy and her inability to continue to function as a useful human being. She vigorously denied that Tarnower's relationship with Tryforos or any other woman played a significant part in her decision. She repeatedly stressed that Tryforos posed no threat to her own relationship with Tarnower, which she portrayed as one of mutual love. Specifically, she described her conversation with Tarnower on the morning of the homicide as being nothing more than one of their usual pleasant exchanges, and indeed, she claimed that he invited her to spend the weekend of April 5 at his home. Mrs. Edwards' testimony was offered to disprove the defendant's alternative state of mind by showing that her relationship with Tarnower was not as she claimed it to have been. Thus, the Edwards' testimony was offered "in denial of [an] affirmative fact which the [defendant] * * * endeavored to prove." *(Marshall v Davies,* 78 NY 414, 420, *supra.)* It was therefore properly received in the People's rebuttal case.

■ Mrs. Harris next levels a vigorous attack upon the conduct of the prosecutor. She claims first that she was severely prejudiced by massive pretrial publicity which, she suggests, was intentionally generated by the prosecution. The record, however, does not support her claim.

It is true that the case was widely reported in the media. However, pretrial publicity, even if pervasive and concentrated, does not necessarily lead to an unfair trial. (See, e.g., *Nebraska Press Assn. v Stuart,* 427 US 539, 565.) Moreover, defense counsel himself participated in much of the coverage of the case, presenting Mrs. Harris' contentions on television and in the print media. Significantly, when proceedings began, Mrs. Harris did not argue that she was unable to receive a fair trial in Westchester County. She did not seek a change of venue, nor did she request a postponement of trial to permit public attention to subside. (Cf. *Irvin v Dowd,* 366 US 717; *Nebraska Press Assn. v Stuart, supra,* at pp 563-564.)

The defendant observes that the District Attorney's decision to file with the indictment a notice containing the substance of statements made by Mrs. Harris on the night of the shooting allowed the press to gain ready access to

those statements. The prosecutor represents that, in taking that action, he was simply following his usual practice. Prosecutors' offices throughout the State follow a similar procedure, often filing with the court a voluntary disclosure form containing the substance of any statement the defendant is alleged to have made. The controlling statutes are not entirely clear as to whether a defendant's statements need be filed with the court and therefore be made public. (Compare, e.g., CPL 200.90, subd 1, with CPL 240.20.) It might well be appropriate for the Legislature to re-examine the disclosure statutes with a view toward permitting a court to shield a defendant's statements from public disclosure pending a determination of their admissibility.

In any event, we cannot find the prosecutor's conduct here to have been prejudicial to the defendant. The purpose of restricting press access to a defendant's statements is to insure that potential jurors are not tainted by exposure to evidence which is subsequently ruled inadmissible. (See, e.g., *Matter of Gannett Co. v De Pasquale*, 43 NY2d 370, 378, affd 443 US 368; *Matter of Westchester Rockland Newspapers v Leggett*, 48 NY2d 430, 438, 439.) Here, none of the defendant's statements was suppressed, and therefore the early access to them enjoyed by the press did not inure to the defendant's prejudice. For the same reason, the defendant was not prejudiced by the court's refusal to exclude the public from the pretrial suppression hearing.

■ The defendant next contends that the prosecutor engaged in unfair cross-examination, compelling her to characterize the People's witnesses as liars. (See, e.g., *People v Delgado*, 79 AD2d 976; *People v Ormond*, 73 AD2d 629; *People v Crossman*, 69 AD2d 887.) This contention is, at best, disingenuous. It was the defendant herself who, during cross-examination, spontaneously accused several prosecution witnesses of committing perjury. Similarly, the defendant's argument that the prosecutor attempted to inject flagrant and prejudicial references to her social standing is entirely devoid of merit. Mrs. Harris herself initiated the colloquy of which she now complains by her remark that "it's not like me to rub up against people like [Lynn Tryforos]". Moreover, the exchange was hardly com-

parable to the situation in *People v Walker* (66 AD2d 863), cited by the defendant, where the prosecutor blatantly injected prejudicial racial references throughout his summation.

Mrs. Harris further argues that she was deprived of a fair trial when the prosecution invaded the councils of the defense. During trial, it was revealed that Prosecutor Bolen had had a telephone conversation with Dr. Francis Ryan, the Chief Medical Examiner for the State of Maine and a former Deputy Medical Examiner of Westchester County, who had been retained by the defense as an expert witness. The defense moved for a mistrial, and the court conducted a hearing to inquire into the circumstances surrounding Bolen's conversation with Ryan. Bolen testified that he knew Ryan professionally and socially and had called him to thank him for a Christmas card. Bolen subsequently turned the conversation to the Harris case, and to the possibility that the bullet that had entered Tarnower's hand had gone on to cause his chest wound. Dr. Ryan suggested that the way to determine whether that had occurred was to examine the slides of the chest wound for any evidence of palmar tissue. After his conversation with Ryan, Bolen asked Dr. Roh, the Medical Examiner, to conduct such a test. Both Dr. Ryan and Dr. Roh did conduct the test and each reported his findings in court. Dr. Ryan testified that, in his examination of the slides of the chest wound, he found no evidence of palmar cells. Dr. Roh testified that such cells were present.

■ We find no merit in the defendant's contention that Bolen's telephone call to Dr. Ryan amounted to an unconstitutional invasion of the councils of the defense. In general, cases which condemn such invasions involve the placement of an informer in the defense camp (see, e.g., *Hoffa v United States,* 385 US 293), or electronic surveillance of defense communications. (See, e.g., *O'Brien v United States,* 386 US 345.) The defendant has directed us to no authority, however, which would prohibit a prosecutor from speaking with a potential witness for the defense. We think such conversations are permissible so long as the prosecutor does not suggest or imply that the witness is in any way obligated to converse with him. In the case at bar,

Bolen testified that he did advise Dr. Ryan that he was under no obligation to speak with him regarding the case. Moreover, not only was the prosecutor entitled to attempt to speak to a defense witness, but any effort by defense counsel to prevent the witness from speaking to the prosecutor might well have constituted an ethical violation. (See American Bar Association, Formal Opn No. 131; Wise, Legal Ethics [2d ed], p 294, and 1979 Supp, p 114.) In any event, we can perceive no prejudice to the defendant as a result of Bolen's conversation with Ryan. Had that conversation not occurred, and had Ryan testified as he did regarding the test in question, Bolen could have then simply notified Roh who could then have performed the test himself. We note that, even prior to the test, Dr. Roh had expressed the opinion in the course of his initial testimony that the bullet which passed through Tarnower's hand had also caused the chest wound.

■ The defendant contends that the prosecutor delivered an unfair summation. The prosecutor's difficulty arose out of the fact that there was only one witness, Mrs. Harris herself, who purported to give a first-hand account of the events which occurred in the Tarnower bedroom on the night of the shooting. The prosecutor attempted to discredit her version and, in summation, suggested a different scenario based upon what he saw to be fair inferences to be drawn from the evidence presented. The defendant's complaint here, and at trial, was that the prosecutor's scenario was not fairly inferable from that evidence. We note, however, that the Trial Judge, prodded by defense objections, closely monitored the prosecutor's remarks. And a reading of the summation in its entirety leads us to conclude that it did not exceed the bounds of proper advocacy. (Cf. *People v Galloway*, 54 NY2d 396; *People v Ashwal*, 39 NY2d 105.) Moreover, the jurors were repeatedly reminded that it was their recollection, rather than that of counsel, that was to control.

■ Mrs. Harris complains that the prosecutor unfairly referred to the wound in Tarnower's posterior shoulder as a "shot in the back." We find no prejudice to the defendant. If there was one thing that the jury knew at the conclusion of this trial it was the precise location of Dr. Tarnower's

wounds. One was inflicted to the posterior aspect of the shoulder, and the testimony was that the bullet traveled downward with a track that went slightly from back to front. Since there was never any real dispute over the location of Dr. Tarnower's wounds, and since the bullet did travel slightly from back to front, we conclude that the defendant's complaint on this point is of little merit.

■ Mrs. Harris next contends that the prosecutor improperly invited the jury to perform tests in the jury room. The defendant would appear to be in no position to complain since, in defense counsel's summation, he twice invited the jurors to test Mrs. Harris' version in the deliberation room. The jurors apparently followed counsel's advice and attempted to re-enact the shooting during their deliberations. The results of this re-enactment convinced them that the shooting could not have occurred as Mrs. Harris described it. Having suggested to the jurors that they conduct an experiment, the defense is hard pressed to complain that they accepted the invitation with results adverse to Mrs. Harris. (See *United States v Hawkins*, 595 F2d 751, 753, cert den 441 US 910.)[5] In any event, we find no evidence of juror misconduct.

In general, a jury verdict may not be impeached by an attack on the conduct of the deliberations. (See, e.g., *People v Brown*, 48 NY2d 388, 393.) Nevertheless, a verdict may be overturned upon a showing of improper influence, embracing not merely corrupt attempts to affect the jury process, but jury conduct which tends to put the jurors in possession of evidence not introduced at trial. *(People v Brown, supra.)* Thus, a verdict may be found to be tainted where a single juror conducts a "test" outside of the deliberations room and reports the results to the jury *(People v Brown, supra)*, or where the jury makes use of objects which have not been introduced into evidence *(United States v Beach*, 296 F2d 153), or where a nonjuror expresses an opinion to the jury regarding the defendant's guilt *(Parker v Gladden*, 385 US 363), or where the jury makes

---

5. It is of some interest that, during redirect examination of a defense expert, counsel asked the witness a question concerning the likely position of Dr. Tarnower. In doing so, defense counsel asked the witness to assume that the desks in the courtroom were the beds in the Tarnower bedroom. Perhaps this demonstration inspired the jurors to conduct the experiment to which complaint is now addressed.

an unauthorized visit to the crime scene *(People v De Lucia,* 20 NY2d 275; *People v Crimmins,* 26 NY2d 319). In contrast, where the jurors attempt to re-enact the crime during their deliberations in accordance with their own recollection of the testimony, their conduct constitutes nothing more than an "application of everyday perceptions and common sense to the issues presented in the trial." *(People v Brown, supra,* at p 393.) Such conduct is permissible and does not taint a subsequent verdict. (See, e.g., *United States v Hephner,* 410 F2d 930; *State v Houston,* 209 NW2d 42 [Iowa]; *State v Thompson,* 164 Mont 415; *Hoover v State,* 107 Tex Cr Rep 600.)

▮ Mrs. Harris next contends that the court should have instructed the jury that one may have two homes within the meaning of the weapons possession statute. She also suggests that the court's definition of the word "home" was insufficient. Any argument that the court's charge on the meaning of "home" was erroneous, inadequate or incomplete, has not been preserved for review. As the record makes clear, at no time did defense counsel take issue with the court's definition of the term, or offer one which he felt would be more appropriate. Moreover, we see no flaw in the definition as given by the court. The question, then, is whether the court erred in refusing to charge that a defendant can have two homes within the meaning of the statute.

First, the court's charge on the question of Mrs. Harris' home did not explicitly state or imply that she could have only one home, nor was the jury ever asked to determine which of either, her house on the Madeira campus or the Tarnower estate, was her true home. Indeed at one point, the court simply told the jury: "You jurors have to decide whether [the Tarnower residence] was in fact *a home * * ** of Mrs. Harris on March 10, 1980." (Emphasis supplied.)

Second, the evidence quite clearly demonstrated that the Tarnower estate was not Mrs. Harris' home within the meaning of the statute. It is true that she testified that she liked to think of it as her home and that she used to buy household items and keep certain of her personal belongings and clothing in the Tarnower house. However, she did not, for example, use the Tarnower estate at any time as a

mailing or voting address, nor did she spend much time there in the year preceding March 10, 1980. (Cf. *People v Douglas,* 82 Misc 2d 971, 972.) Rather, by that date, Mrs. Harris had become a relatively infrequent visitor to the Tarnower home. Indeed, by her own testimony, she had to call Tarnower and virtually beg him to permit her to come to his home on March 10, 1980, and he only reluctantly agreed. And, in response to questioning on cross-examination, Mrs. Harris made a point of stating that she never came to the Tarnower residence unless she was invited to do so. It would seem self-evident that one does not generally need an invitation to return to one's own home. For these reasons, then, we conclude that no error was committed with respect to the court's charge on the question of the defendant's home. (See *People v Powell,* 54 NY2d 524.)

Finally, we come to the most difficult and troubling of the defendant's contentions. Mrs. Harris strenuously challenges the admissibility of the statement she made on the telephone to her attorney. That statement was overheard and testified to in court by Officer Tamilio.

The evidence presented at the suppression hearing established that, when Mrs. Harris asked to speak to her attorney, she had already admitted having shot Dr. Tarnower. She had been advised of her *Miranda* rights no fewer than three times. She had seen Dr. Tarnower carried down the stairs and out to a waiting ambulance, and this sight had apparently caused her to faint. When Lieutenant Flick later asked her if she wanted to call anyone, she replied that she wanted to call a lawyer friend in New York City. She was permitted to proceed unescorted to the kitchen to make such a call. However, the kitchen telephone was inoperable. Thereupon, having ascertained that there was a telephone in the servants' quarters, Lieutenant Flick placed a call at Mrs. Harris' request to her lawyer, Leslie Jacobson. When Jacobson asked to speak with Mrs. Harris, Flick returned to the foyer where the defendant was seated with Officer Tamilio. Flick told the defendant that the party she wanted was on the telephone and asked Tamilio to assist her into the bedroom. Tamilio walked with Mrs. Harris, helping her to a chair near the telephone. The bedroom itself had two exits, the doorway

through which Mrs. Harris had walked, and a sliding door which led out to the garden and off the Tarnower property.

When Mrs. Harris picked up the telephone, Tamilio retreated to the doorway. At the suppression hearing, he testified that, in a "nervous, sorrowful" voice, Mrs. Harris said to her attorney, "Oh, my God, I think I've killed Hy." The court refused to suppress the statement and, in summation, the prosecutor pointed to it as one of the indications that Mrs. Harris had had an intent to kill Tarnower.

Mrs. Harris now contends that the court's failure to suppress the statement constituted a violation of her right to counsel. Her argument is not similar to those usually advanced in connection with a failure to suppress statements. It is undisputed that she was advised of her constitutional rights at least three times — this by her own admission. Indeed, she signed a *Miranda* waiver card. It is similarly undisputed that, following her request to speak to an attorney, the police engaged in no further interrogation. The issue, then, does not involve the alleged unlawful questioning of a suspect who has requested counsel, or a contested waiver of *Miranda* rights. Rather, the question here concerns the extent of the obligation of the police to afford privacy to a suspect who, while in custody, confers with her attorney about the pending charge. And, since there seems to be no suggestion that Officer Tamilio intended to eavesdrop on Mrs. Harris' conversation, the issue may be more narrowly stated as whether a police officer may report in court a statement made by a suspect to his attorney which the officer had inadvertently overheard.

At the outset, we note that we find no police misconduct here. (Cf. *People v Grimaldi,* 52 NY2d 611.) Mrs. Harris had been arrested for a felony. The bedroom in which she was speaking had two exits. In retreating to the doorway of the room, Officer Tamilio afforded Mrs. Harris as much privacy as he could consistent with his obligation to retain custody and control over a person under arrest for a serious crime. Significantly, Tamilio did nothing to conceal his presence from Mrs. Harris and, as testified, she spoke in the obvious presence of Henri van der Vreken, who was seated a few feet away from her. Nevertheless, the absence

of police misconduct is not dispositive of the defendant's claim.

In *People v McLaughlin* (291 NY 480, 482-483) our Court of Appeals wrote that: "To give [the right to counsel] 'life and effect * * * it must be held to confer upon [a defendant] every privilege which will make the presence of counsel upon the trial a valuable right, and this must include a private interview with his counsel prior to the trial'". (See, also, *Matter of Fusco v Moses,* 304 NY 424, 433.) Federal courts have held likewise. Thus, in *Coplon v United States* (191 F2d 749, 757, cert den 342 US 926), the court stated that, "[i]t is well established that an accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him." Indeed, it has been observed that "the essence of the Sixth Amendment right is * * * privacy of communication with counsel." *(United States v Rosner,* 485 F2d 1213, 1224, cert den 417 US 950; see, also, *Weatherford v Bursey,* 429 US 545, 563 [MARSHALL, J. dissenting]; *Caldwell v United States,* 205 F2d 879.) Moreover, the courts of this State have shown a "special solicitude" for an accused's right to counsel, affording protections well beyond those required by the Federal Constitution. (See *People v Cunningham,* 49 NY2d 203, 207; *People v Hobson,* 39 NY2d 479.)

 In keeping with our State's policy of jealously guarding the right to counsel, we hold that, once that right has attached, no statement which a suspect directs to his attorney may be reported at trial by a police officer, regardless of whether he intentionally or inadvertently overheard it. (See *People v Rainey,* 34 AD2d 557, app dsmd 27 NY2d 748.) We conclude, therefore, that the court's refusal to suppress Mrs. Harris' statement to her attorney was error. After a careful reading of the entire record, however, we are convinced that the admission of the statement was harmless beyond a reasonable doubt. (See *People v Crimmins,* 36 NY2d 230.)

We note first that the prosecutor's attempt to use the statement in summation is not conclusive of its evidentiary value. Indeed, his arguments seemed to be a misguided response to defense counsel's comment in summation which suggested that the statement was fully consistent

with Mrs. Harris' version of the shooting. Defense counsel argued to the jury: "And later on, later on, after [Mrs. Harris] had been back up to see Hy, and of course Hy looked different when she came back than he looked when she left, she said to her lawyer on the phone, 'I think I've killed Hy.' And again, she was speaking the truth. Not 'I intended to kill Hy.'"

Prior to making the statement to her attorney, Mrs. Harris had told the police several times that she had shot Dr. Tarnower. Although she claims to have remembered shooting him only in the hand, and said as much to the detective at the scene, it is essentially undisputed that she, in fact, inflicted all of Tarnower's wounds. Indeed, at trial, Mrs. Harris did not suggest that she did not inflict those wounds, but only that she did not intend to do so. According to Mrs. Harris' testimony, when she returned to the house with Officer McKenna, she was still under the belief that Tarnower had suffered only a hand wound. When she saw him, however, he appeared to be in a far more serious condition than one who had received only a wound to the hand. Indeed, Mrs. Harris testified that Tarnower was no longer able to speak. Thereafter, Mrs. Harris saw the doctor, in obviously grave condition, being carried out of the house to a waiting ambulance. The sight of him so affected her that it caused her to faint. By this time, Mrs. Harris had indicated her awareness of the apparent fact that Tarnower was in danger of death, for she remarked to Lieutenant Flick that she thought it ironic that the doctor was dying, although it was she who wanted to die. It was subsequent to that realization, as expressed in her comment to Lieutenant Flick, that Mrs. Harris made the statement to her attorney.

In our view, the statement, "Oh, my God, I think I've killed Hy", made under these circumstances, neither indicates nor suggests an intent to kill on the part of Mrs. Harris. Indeed, it suggests the contrary since it reflects her surprise at Tarnower's condition and her uncertainty with respect to her responsibility for that condition. Thus, the statement is fully consistent with Mrs. Harris' claim that the shooting of Dr. Tarnower had been unintentional. We,

therefore, hold that the admission of Mrs. Harris' statement, although error, was harmless.

It has long been recognized that, although all trials must be fair, few can be described as perfect. (See, e.g., *People v Arce,* 42 NY2d 179, 187.) After a painstaking reading of this lengthy record, and a careful consideration of each of the defendant's arguments, we are convinced that, although Jean Harris did not receive a perfect trial, she received an eminently fair one. Nothing more is required.

Accordingly, we affirm the judgment in all respects.

HOPKINS, TITONE, WEINSTEIN and BRACKEN, JJ., concur.

Judgment of the County Court, Westchester County, rendered March 20, 1981, as amended May 6, 1981, affirmed.