# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 74408-9-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| SHAVEL LEVRON POPE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: March 26, 2018 |

SPEARMAN, J. — Shavel Pope shot bullets into Jermaine Hickles' car, striking Hickles in the arm. Pope was charged with drive-by shooting, first degree assault, and unlawful possession of a firearm. During trial, the prosecutor made several references to Pope being a rap musician, even though the trial court had excluded Pope's lyrics. During trial and deliberations, jurors engaged in two reenactments of testimony, and one juror referenced a map at home. Pope was convicted as charged. He appeals, arguing that he is entitled to a new trial due to juror and prosecutorial misconduct. We disagree and affirm.

## FACTS

Jermaine Hickles and Roberta Castillo broke off their relationship in 2010. When Castillo started dating Shavel Pope in 2012, she told Pope that Hickles physically abused her. She also told Pope that Hickles had threatened a man she

dated because he was driving her car, and that Hickles later shot at her car. She told Pope that Hickles had guns, and had threatened to kill Pope if he saw him driving one of her cars.

On May 21, 2014, Castillo and her daughter drove to a laundromat to wash their clothes. Pope followed in Castillo's maroon Hummer to buy gas at an adjacent station. As Castillo waited for Pope to arrive, she saw Hickles drive through the parking lot in his blue Tahoe, looking angry. Fearful, Castillo called Pope, but he didn't answer. When Pope finally pulled into the parking lot, Castillo told him that she could have been killed and asked him why he didn't pick up his phone. After Castillo and Pope finished pumping gas, Castillo and her daughter went into the laundromat. Castillo testified that while she was doing laundry, Hickles circled through the parking lot at least five times, burning rubber each time.

Pope testified that after filling his tank, he drove home to fetch his phone and wallet. But, he returned to the gas station out of concern for Castillo's safety. He parked the Hummer and played games on his phone while he waited. Pope testified that Hickles drove through the parking lot once, and then came back ten or fifteen minutes later. Hickles drove very slowly and stopped in front of Pope, blocking the Hummer. A car driven by Gustavo Ramos, a friend of Hickles, also blocked Pope. Pope testified that, after a verbal exchange, Hickles raised a gun towards him and shot at him several times. Pope ducked, opened the console between the two front seats, retrieved a gun, and shot at Hickles multiple times. After the exchange of gunfire, Ramos moved his car enough that Pope could

maneuver his car out of the parking lot. Pope fled the scene, but Hickles followed him. After a brief chase, Pope made it to the freeway and drove south to the home of his children. Pope, a musician, then drove the Hummer to California to perform scheduled tour dates. He testified that on his way, he threw the gun in the Tacoma River. He returned to Washington without the Hummer.

Hickles described events differently. He testified that he pulled into the strip mall once to buy a soda, but left after seeing Castillo. He drove around for an hour or so, returned, parked, and bought a soda. After Hickles returned to his truck, Pope pulled up next to him, accused him of harassing Castillo, and then shot at him. Hickles ducked down, but was hit once in the arm. Hickles denied that he was armed, and no gun was found in his vehicle. Hickles also testified that his friend, Ramos, happened to be driving by when he saw Hickles get shot, and came to his aid. Ramos confirmed that he was a bystander, and that he guarded Hickles' car after Hickles went to the hospital, and did not see a gun inside.

One witness with expertise in guns testified that he heard seven to nine gunshots from the same gun, fired in two sets, close together. He testified that the shots were not from multiple shooters because the gunfire did not overlap. Another witness, Patricia Loveridge, was driving by when she saw two trucks, one black and one maroon, side by side blocking the entrance to the parking lot. She heard five or six shots, looked in her rearview mirror, and saw an arm extended from the window of a black truck, shooting into the window of the other truck.

Pope was charged with first degree assault with a firearms enhancement, second degree unlawful possession of a firearm, and drive-by shooting. He was convicted as charged.

After trial, jurors disclosed that one juror reenacted Pope's testimony at home by placing a glove, representing a gun, in her car's console. Then she tested how long it took to retrieve and "fire." Clerk's Papers (CP) at 158. Another juror looked at a map to try to find the "Tacoma River." CP at 172. Finally, several jurors reenacted Loveridge's testimony with a mirror in the jury room. Based on these allegations of misconduct, defense counsel moved for a new trial. The trial court denied the motion.

DISCUSSION

Juror Misconduct

Pope alleges three instances of juror misconduct: the gun retrieval reenactment, the rearview mirror experiment in the jury room, and the Tacoma River map consultation. The State argues that juror declarations supporting the misconduct claims describe matters inhering in the verdict, so they cannot be considered by this court.

Central to our jury system is the secrecy of jury deliberations. In re Pers. Restraint of Lui, 188 Wn.2d 525, 567-68, 397 P.3d 90 (2017) (citing Long v. Brusco Tug & Barge, Inc., 185 Wn.2d 127, 131, 368 P.3d 478 (2016)). Courts are appropriately forbidden from receiving information to impeach a verdict based on revealing the details of the jury's deliberations. Id. Thus, in considering whether to declare a mistrial based on alleged juror misconduct, the first question is

whether the facts alleged inhere in the verdict. Id. Whether juror misconduct inheres in the verdict is a question of law that we review de novo. Id. (citing Ayers v. Johnson & Johnson Baby Prods. Co., 117 Wn.2d 747, 768, 818 P.2d 1337 (1991)).

Matters that inhere in the verdict include facts "'linked to the juror's motive, intent, or belief, or describ[ing] their effect upon'" the jury, or facts that cannot be rebutted by other testimony without probing any juror's mental processes. Id. at 131-32 (quoting Gardner v. Malone, 60 Wn.2d 836, 841, 376 P.2d 651 (1962)). Jurors discussing and using their life experiences to evaluate evidence and reach a verdict inheres in the verdict and may not be considered. Id. at 137. This contrasts with circumstances in which jurors introduce extrinsic evidence into their deliberations. "In such cases, the juror statements were plainly not matters of opinion based on personal experience, but expressions of law or fact based on outside sources." Id. (citing Bouton–Perkins Lumber Co. v. Huston, 81 Wash. 678, 680, 143 P. 146 (1914)).

Only if we conclude that the juror declarations allege actual facts constituting misconduct, rather than matters inhering in the verdict, do we then decide whether the trial court's denial of a motion for a new trial for juror misconduct was an abuse of discretion. State v. Crowell, 92 Wn.2d 143, 145, 594 P.2d 905 (1979).

Here, juror declarations largely describe expressions of fact, not matters of opinion based on personal experience.[1] Jurors reported that one juror tested the theory of self-defense by timing how long it took her to retrieve a glove from her car's console. This does not describe a juror's motive, intent, or belief, and may be rebutted by testimony that the juror did not report such an experiment. Similarly, jurors reported recreating the testimony of Loveridge: "[S]omebody used a compact and one person had – I had pointed my hand at one person, they had pointed their hand back at me and we looked into the compact to see how it would look." CP at 169. Again, this does not describe the jurors' motive, intent, or belief, and can be rebutted without questioning the juror's mindset. Finally, a juror consulted a map and reported that she could not find the Tacoma River. This is an expression of fact based on an outside source, and does not inhere in the verdict.[2]

Because we conclude that the declarations allege actual facts constituting misconduct, rather than matters inhering in the verdict, we now turn to whether the trial court abused its discretion by denying a motion for a new trial based on juror misconduct. The consideration of novel or extrinsic evidence by a jury is misconduct and can be grounds for a new trial. Such evidence is improper

---

[1] The State argues that the juror declarations describing the gun retrieval and Tacoma River misconduct claims are hearsay, and cannot be relied on to support the misconduct claims. But the report of the experiments, not whether they occurred, is the basis of the misconduct claims. Thus, these out of court statements are not hearsay because they are not used to prove the truth of the matter asserted. Evidence Rule 801.

[2] To the extent that parts of the juror declarations describe the effect of the alleged misconduct on the jury, such allegations do inhere in the verdict and are not considered to determine whether the misconduct prejudiced the proceeding. State v. Boling, 131 Wn. App. 329, 332–33, 127 P.3d 740 (2006); Gardner, 60 Wn.2d at 843.

because it is not subject to objection, cross examination, explanation or rebuttal. State v. Balisok, 123 Wn.2d 114, 118, 866 P.2d 631 (1994) (citing Halverson v. Anderson, 82 Wn.2d 746, 752, 513 P.2d 827 (1973). But "where the jurors attempt to re-enact the crime during their deliberations in accordance with their own recollection of the testimony, their conduct constitutes nothing more than an 'application of everyday perceptions and common sense to the issues presented in the trial.'" Id. at 118 (quoting People v. Harris, 84 A.D.2d 63, 105, 445 N.Y.S.2d 520, 546, 31 A.L.R.4th 525 (1981)).

> [If] the experiment or what the jury has done, has the effect of putting them in possession of material facts which should have been supported by evidence upon the trial, but which was not offered, this generally constitutes such misconduct as will vitiate the verdict. But if the experiment involves merely a more critical examination of an exhibit than had been made of it in the court, there is no ground of objection.

Id. at 119 (quoting State v. Everson, 166 Wash. 534, 536-37, 7 P.2d 603 (1932).

Juror use of extrinsic evidence is misconduct and entitles a defendant to a new trial, if the defendant has been prejudiced. Boling, 131 Wn. App. at 332-33 (citing State v. Briggs, 55 Wn. App. 44, 55, 776 P.2d 1347 (1989)). The court's inquiry is objective: The question is whether the extrinsic evidence could have affected the jury's determinations. Id. (citing State v. Caliguri, 99 Wn.2d 501, 509, 664 P.2d 466 (1983)).

In Balisok, the defendant testified that when the victim attacked him with a dagger and placed him in a headlock, the defendant pulled a pistol out of his pocket and shot the victim in the head. The defendant, weighing over 300 pounds, simulated this at trial. During deliberations, the jurors reenacted the

struggle as described by the defendant, and concluded that it was "virtually impossible. . . ." Id. at 116-17. The Court held that there was no misconduct, reasoning that differences in the circumstances of the reenactment were not material and that the jurors' actions "amounted to nothing more than a critical examination of [the defendant's] self-defense theory." Id. at 120.

In a similar case, the defendant testified that as the victim brought his shoulder back to punch her, she reached into her coat pocket, grasped and opened a folding knife, and cut the victim across the nose. State v. Brown, 139 Wn.2d 20, 22, 983 P.2d 608 (1999), overruled on other grounds by State v. Houston-Sconiers, 188 Wn.2d 1, 391 P.3d 409 (2017). During deliberations, the jurors wore the victim's coat and tested the difficulty of pulling the defendant's knife out of the pocket and opening it. Id. at 23. The court held that this reenactment was not misconduct because the differences in coats was not material and the jury properly used admitted evidence to critically examine the defendant's version of events. Id. at 24.

Pope argues that the gun retrieval reenactment was juror misconduct. At trial, Pope testified that Hickles fired several shots, Pope ducked, reached in the console, grabbed a gun, and reached over and shot at Hickles, with a "pause for a second" between each barrage of bullets. Verbatim Report of Proceedings (VRP) at 827-28. Other witnesses testified that the series of less than ten shots was either continuous or separated by a brief pause after the first several shots. While at home, the juror sat in her car, placed a glove in the console, and closed the lid. She timed how long it took to unbuckle her seatbelt, open the lid, retrieve

8

the glove, and turn to "'fire.'" CP at 176-77. This juror reported to the jury that it took her longer to perform those activities than what the testimony reflected, so she concluded that Pope already had his gun out.

Similar to the jurors' knife retrieval in Brown, this juror tested if the defendant could retrieve a gun from a car's console in a short amount of time. This was a critical examination of Pope's self-defense theory. Any juror was free to question Pope's testimony that he retrieved the gun in a short period of time. This juror merely examined the reliability of that testimony through her own reenactment and reported her finding to the jury. The juror did not introduce new evidence that could not be rebutted, such as the impossibility of retrieving a gun in a certain amount of time. Rather, the juror expressed doubts about the defendant's credibility because of the length of time it took to retrieve the glove.

That this juror was at home rather than in the jury room does not impact the result. Balisok holds that jurors may use their common sense to understand divergences in the reenactment, such as the difference between a glove and a gun. And Pope cites no Washington authority holding that an out-of-court reenactment should be considered differently than one conducted in the jury room. The gun retrieval reenactment was not misconduct.

Pope next argues that the rearview mirror reenactment is juror misconduct because it did not conform to the evidence. During deliberations, two jurors sat in chairs and pretended to point guns at each other. A third juror sat in front and used a compact mirror to observe the jurors behind her. The jurors wondered whether the testimony of Loveridge, who witnessed the shooting through her

9

rearview mirror, was reliable because a mirror reverses images. Pope did not brief this alleged misconduct to the trial court, and conceded at the trial court that it did not constitute misconduct.

Generally, we do not consider arguments raised for the first time on appeal. RAP 2.5(a). But a defendant may appeal a manifest error affecting a constitutional right even if the issue was not raised at the trial court. RAP 2.5(a)(3). The defendant must identify a constitutional error and show that it resulted in actual prejudice, which means that it had practical and identifiable consequences in the proceeding. State v. Roberts, 142 Wn.2d 471, 500, 14 P.3d 713 (2000).

Pope meets the first part of the RAP 2.5(a)(3) analysis because his claimed error implicates the constitutional guarantee to a trial by impartial jury. But he does not satisfy the second part. The mirror reenactment was not prejudicial because it does not constitute juror misconduct. Through this reenactment, the jurors properly applied their everyday perceptions and common sense to the issues presented at trial. And under Balisok and Brown, the difference between the mirror used by the jurors and the rearview mirror in the witness's car is not material. The jurors used their common sense to understand that the mirrors were not the same.

Pope cites Cole v. McGhie, 59 Wn.2d 436, 447, 367 P.2d 844 (1962), in which jurors visited the site of an accident in which the plaintiff tripped on a timber, and were instructed to walk across the timber. On appeal, the Court granted a new trial because the experiment allowed jurors to acquire new

evidence by stepping over the timber. Cole, 59 Wn.2d at 446. Cole is distinguishable because the juror's use of a mirror did not allow them to acquire new evidence. Rather it enabled them to visualize, and therefore critically examine, witness testimony.

Because Pope fails to show he was prejudiced by the alleged misconduct of reenacting the rearview mirror testimony, we decline to review the claim under RAP 2.5(a)(3).[3]

Finally, Pope argues that a juror committed prejudicial misconduct by referring to a map to find the "Tacoma River." After hearing Pope's testimony that he threw the gun into the Tacoma River, one juror reported searching a map for the "Tacoma River" with a magnifying glass. CP at 151. She did not find it and concluded that Pope did not actually throw the gun into the Tacoma River. The trial court found that this constituted misconduct, but that there was no "reasonable possibility that [Mr. Pope] was prejudiced by that. . . ." VRP at 1164.

The State concedes that this action was misconduct, but not prejudicial. We agree. Pope testified that he disposed of the gun in a river. The name of the river is immaterial. In addition, Pope testified that he was not familiar with the area because he was from California. His counsel referenced this fact in closing argument. It is therefore reasonable to conclude that the jury did not make a

---

[3] Pope's argument that he received ineffective assistance of counsel also fails. An ineffective assistance claim requires that (1) counsel's performance "fell below an objective standard of reasonableness and (2) there was prejudice, measured as a reasonable probability that the result of the proceeding would have been different." State v. Humphries, 181 Wn.2d 708, 720, 336 P.3d 1121 (2014) (citing Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Even if counsel's waiver was deficient performance, it did not result in prejudice because Pope would not have succeeded on the claim.

substantial credibility assessment based on Pope's river misnomer. The map reference was not prejudicial.

The trial court did not abuse its discretion by denying Pope's motion for a new trial based on juror misconduct.

Prosecutorial Misconduct

Pope argues that the prosecutor committed misconduct by referencing his rap music. He contends that, in spite of his failure to object, he did not waive his challenge because the prosecutor's actions violated a ruling by the court.

Pope moved in limine to exclude testimony or reference to his music lyrics. The State responded that it intended to introduce the lyrics if relevant to impeach Pope's testimony. The trial court clarified, "the State is not going to talk about rap music or lyrics to rap music or anything at all during the case-in-chief; is that right? Or maybe talk about, you know, he is a rap artist or something like that, but not go into details?" VRP at 1317. The State confirmed, but clarified that witnesses may reference Pope's stage name, Guce. Id. The trial court reserved ruling until the State sought to introduce the lyrics in rebuttal to specific testimony. The trial court warned that "I don't know what the evidence is going to be ... if he pulls up the CD and marks it as an exhibit, that would be your heads-up. You can object ... if somehow it's being offered into evidence or questions asked about it." VRP at 1318. At trial, the State moved to introduce lyrics to rebut Pope's testimony that he had worked at a boys' home and a hospital, and that he is not the type of person who abuses women. The court excluded the lyrics.

Pope objects to three references to his rap music. First, the prosecutor cross-examined Castillo's daughter, Sonia, about whether Pope discussed guns:

Q: Even through his music did he ever say anything about that?
A: Specifically, I don't know. But if he did, it's the rap industry. It's for entertainment.
Q: And you listen to his music?
A: Yeah
Mr. Gehrke: Objection. Beyond the scope.
The Court: Overruled.
Q: (By Mr. Sewell) And how much, how often do you listen to his music?
A: Pretty often.
Mr. Gehrke: Your Honor –
The Court: All right.
Mr. Gehrke: I have objection regarding some of the earlier motions.
The Court: Yeah. Do we need to excuse the jury, or are we moving on?
Mr. Sewell: I can move on.

...

Q: (By Mr. Sewell) You mentioned that he talked about a "burner." What's a burner?
A: A gun.
Q: It's a slang term for a gun?
A: Yeah. It's what all rappers use.
Q: Any other slang terms for guns that you know of?...

VRP at 807-808. This exchange occurred before the trial court excluded Pope's lyrics. The second allegation of misconduct occurred after the trial court's ruling, when the prosecutor cross-examined Pope:

Q: You testified on direct examination that you're a musician.
A. I'm a producer, a CEO.
Q. You're a producer, a CEO; you don't sing?
A. I do music and I do fashion and I --
Q. What do you mean when you say you "do music?"
A. We produce, we write for people, people write for us.
Q. So that includes you singing this music as well?
A. Yeah, we perform mostly college towns up and down the coast.
Q. You testified you produce R&B music; is that right?
A. Yeah, I got a R&B artist.
Q. What other types of music do you produce?
A. Hip hop.
Q. Hip hop. What's hip hop?

A. I don't know. What's you mean? What do you mean "what is hip hop?"
Q. When you say "hip hop," that's pretty expansive. A lot of types of music fall under hip hop, so what types of hip hop do you produce?
A. Not how I was raised. Hip hop is hip hop.
Q. And to be clear, you also testified that you've got family members that are gospel singers, famous gospel singers; is that right?
A. My mother, the Pope Sisters.
Q. That's right.
A. Yes.
Q. But you're not a gospel singer?
A. No, I'm not.
Q. And you're not a choir boy or anything along those lines?
A. I sang in the church when I was little.
Q. Do you now?
A. No.

VRP at 888-90. Third, the prosecutor argued in closing:

> The defendant went to great lengths to paint himself in a positive light. If you recall, when asked, he wouldn't say what kind of music he performed. You had to hear it through Sonia that he's a rapper. So why all the talk about how he promotes R&B artists and hip-hop and how his mother and aunt were famous gospel singers? There's absolutely nothing wrong with rap. I want to make that clear. So why was he so reluctant to say it? If he was so reluctant to talk about something as small as that, what else might he be trying to keep from you? Rap music isn't something you would or should hold against him. You should hold the evidence against him.

VRP at 1033.

To prevail on a claim of prosecutorial misconduct, the defendant must show that the prosecutor's conduct was both improper and prejudicial. State v. Weber, 159 Wn.2d 252, 270, 149 P.3d 646 (2006) (citing State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)). If the defendant did not object at trial, the issue is waived unless the "prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." State

14

v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012) (citing State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997)).

Citing Weber, Pope argues that he did not waive his claim because he need not object once the court excluded the lyrics. But Pope mischaracterizes Weber, which holds that parties who successfully exclude evidence must object to attempts to introduce such evidence in order to preserve the issue for appeal. Weber, 159 Wn.2d at 272. There is a limited exception to this rule where the State's questioning is in deliberate disregard of the court's ruling. Id.

Pope did not object to the testimony and argument he now challenges.[4] He was not excused from objecting under Weber because the prosecutor did not deliberately disregard the court's ruling on the admissibility of music lyrics. After the court's ruling, the prosecutor merely referred to Pope as a rap musician.

The next inquiry is whether the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. Pope argues that the prosecutor deliberately appealed to the jury's passions and prejudice, and attacked his character. But it was Sonia, questioned by defense counsel on direct, who was the first to associate him with rap music. The prosecutor's questioning and argument was not flagrant or ill intentioned misconduct; it was follow up to Sonia's testimony.

Pope waived his prosecutorial misconduct claims.

---

[4] Pope objected to Castillo's daughter's testimony, but first on grounds of scope, and then successfully stopped the prosecutor's line of questioning. He did not object to the State's question about whether Pope rapped about guns, which most closely aligns with the pretrial motion to exclude rap lyrics.

Cumulative Error

Pope argues that multiple instances of juror and prosecutorial misconduct denied him a fundamentally fair trial. A defendant may be entitled to a new trial when cumulative errors make a trial fundamentally unfair. State v. Coe, 101 Wn.2d 772, 789, 684 P.2d 668 (1984). Pope's challenges fail, and he is not entitled to a new trial because he was not deprived a fundamentally fair trial.

Statement of Additional Grounds

Pope advances a number of additional challenges in his statement of additional grounds (SAG).

Pope argues that his convictions for first degree assault and drive by shooting violate double jeopardy. First degree assault and drive by shooting are not the same in law. State v. Statler, 160 Wn. App. 622, 639, 248 P.3d 165 (2011). But the inquiry does not stop there. We must look at the facts used to prove the statutory elements to determine whether each offense required proof of a fact that the other did not. Blockburger v. United States, 284 U.S. 299, 303, 52 S. Ct. 180, 76 L. Ed. 306 (1932). Here, evidence that Pope fired a gun was required to prove both his convictions for drive-by shooting and first degree assault. But each offense also required proof of a fact that the other did not. With respect to the first degree assault, the State had to prove that Pope's shooting was directed at Hickles with intent to inflict great bodily harm. To prove drive-by shooting, the State had to prove that Pope discharged a weapon from a vehicle or in proximity to a vehicle in a manner that created a substantial risk of death or serious injury to another person. This is not a case where evidence of a single

act was required to prove multiple offenses and was the sole evidence to prove those charges. The evidence that Pope fired one bullet at Hickles' car was all that was needed to prove first degree assault. This evidence was available, but not required, to support the drive by shooting conviction. That crime was also established by evidence that Pope fired multiple subsequent bullets. The first degree assault and drive by shooting convictions do not violate double jeopardy.

Pope argues that the Information was deficient because it did not include a specific charge of firearm enhancement. But the amended Information does contain a firearm enhancement allegation for count 1, Assault in the first degree. The jury found facts supporting the firearms enhancement as charged.

Pope argues that the prosecutor engaged in misconduct. First, he argues that the prosecutor attempted to discredit witnesses Loveridge and Daniel Castillo while vouching for witnesses Ramos and Hickles. Second, Pope argues that the testimony of Hickles and Ramos was false and inconsistent, and that there was an exculpatory video, so the prosecutor knowingly used perjured testimony to obtain a conviction.

Pope's counsel failed to object to any of the testimony or argument now challenged, so his claim is waived unless the misconduct was so flagrant and ill intentioned that it results in enduring prejudice that a curative instruction cannot remedy. A prosecutor's expressions of personal opinion about the defendant's guilt or the witness's credibility are improper. State v. Dhaliwal, 150 Wn.2d 559, 577-78, 79 P.3d 432 (2003). To determine whether the prosecutor is expressing a personal opinion about the defendant's guilt, independent of the evidence, we

view the challenged comments in context. State v. McKenzie, 157 Wn.2d 44, 53, 134 P.3d 221 (2006).

Pope first objects to the manner in which the prosecutor questioned witness Loveridge. But the prosecutor was merely eliciting eyewitness testimony in a somewhat critical manner, which is not misconduct. The argument that he did so with a "sneer" assumes facts not evidence. Pope also argues that the prosecutor's closing argument compared Loveridge to "killer texters." SAG at 11. But the prosecutor did no such thing. He appropriately argued that Loveridge's testimony may not be reliable because she witnessed the shooting while driving and testified to being distracted. This is not a personal opinion of credibility, but an argument from the evidence.

Pope suggests that the prosecutor called Daniel Castillo a liar in closing arguments. The prosecutor did not call Castillo a liar. When discussing Castillo's testimony, the prosecutor was making an argument about the credibility of Pope's testimony based on admitted evidence. This is not misconduct.

Pope contends that the prosecutor vouched for Hickles by questioning the veracity of Pope's testimony that Hickles chased him after the shooting. He also argues that the prosecutor vouched for Ramos by stating that Ramos testified that he saw gunfire from the Hummer after randomly arriving at the scene. A prosecutor commits misconduct by vouching for a witness's credibility. State v. Robinson, 189 Wn. App. 877, 892, 359 P.3d 874 (2015). But the prosecutor here did not vouch. He made proper closing arguments based on the evidence.

Pope also argues that the prosecutor engaged in misconduct by knowingly offering perjured testimony and failing to disclose an exculpatory video to police investigators. Pope offers no evidence that Hickles and Ramos engaged in perjury, or that the prosecutor knowingly offered perjured testimony. And we find nothing in the record to support the claim that the prosecutor knowingly kept the video from police investigators. To the extent these claims rely on evidence not in the record, we decline to consider them. State v. Alvarado, 164 Wn.2d 556, 569, 192 P.3d 345 (2008).

Pope argues that he received ineffective assistance of counsel due to his attorney's deficient investigation. Specifically, he argues that his attorney failed to interview the two passengers in Ramos' car. But the record is silent regarding trial counsel's lack of attempt to interview these witnesses. Because this claim appears to rely on evidence that is not in the record, we decline to consider it.

Pope argues that he received ineffective assistance of counsel because his attorney did not obtain the paperwork for Castillo's petition to renew a "restraining order" protecting Castillo against Hickles. Again, we decline to review this claim because it is based on facts or evidence not in the record. We do not know whether Pope's trial counsel attempted to, or obtained, the restraining order documentation.

Finally, Pope argues that we should reverse his convictions due to the cumulative effect of ineffective assistance of counsel. Pope's challenges fail, so he is not entitled to a new trial due to cumulative error.

19

No. 74408-9-I/20

Affirmed.

WE CONCUR:

Spearman, J.

Cox, J.

20